**Anthony M. REINACH, Petitioner-Appellant,**

v.

**COMMISSIONER OF INTERNAL REVENUE, Respondent-Appellee.**

**No. 244, Docket 30568.**

United States Court of Appeals Second Circuit.

Argued Jan. 19, 1967.

Decided Feb. 27, 1967.

As Amended on Denial of Rehearing April 14, 1967.

Jerome Kamerman, New York City, for petitioner-appellant.

Elmer J. Kelsey, Washington, D. C. (Mitchell Rogovin, Asst. Atty. Gen., Lee A. Jackson, Harry Baum, Washington, D. C., on the brief), for respondent-appellee.

Before MEDINA, ANDERSON and FEINBERG, Circuit Judges.

FEINBERG, Circuit Judge:

Taxpayer Anthony Reinach petitions for review of a decision of the Tax

Court[1] affirming the assessment of certain deficiencies for the taxable years 1956, 1959, and 1960. We are asked to determine whether losses taxpayer sustained were capital or ordinary and, if the latter, whether the losses occurred in 1959 or 1960. We conclude that taxpayer's losses were capital and affirm the judgment of the Tax Court.

In the taxable years under examination, Anthony Reinach was a self-employed writer of put and call options, to which end he rented office space, hired a secretary, and incurred other related expenses. To understand the legal issues in dispute it is necessary to describe—in an oversimplified way to be sure—the put and call market. A "put" is an option to sell and a "call" is an option to buy a specified number of shares of stock at a set price at any time within an agreed-upon period. These options are granted in consideration of a cash payment, the "premium." Standard-form contracts are used for puts and calls;[2] each option is negotiable and is endorsed by a member firm of the New York Stock Exchange. Ordinarily, puts and calls are issued on blocks of 100 shares of a popular stock listed on a national exchange. The duration of the option usually ranges from thirty days to six months and ten days. The price at which the named stock can be put or called is ordinarily the market price when the option is written and is termed the "striking price." In order to exercise an option, it must be physically presented before expiration to the stock exchange firm that endorsed it. Options are customarily purchased by the public from put and call broker-dealers, but it is seldom they who create the option contracts they sell.[3] Rather, that is the function of writers; the writer is in contact with the put and call broker. Either one or the other may suggest writing a particular option; then they negotiate the terms, the principal bargaining point being what premium the writer will receive. Premiums vary depending on numerous factors, including the risk to the writer the particular option involves and the demand from the public. The broker's gross profit is the difference between the premium he charges his customer and what he must pay the writer.[4] The maximum profit an option writer can make from writing the option alone[5] is the full premium he receives. This he keeps, of course, when the stock price either remains steady during the option life or fluctuates in his favor, i. e., declines on a call or rises on a put. For then the optionee will find it unprofitable to exercise his rights.

From March 29, 1956, to August 7, 1958, Reinach wrote 412 option contracts. In the case of options which were exercised, his behavior is significant: In every case of an exercised put, Reinach disposed of the put stock immediately; he never held onto a stock put to him in order to speculate on a subsequent price rise. In the case of calls, in not one instance did he own (or was he "long") the shares involved in these options when he wrote them.[6] In operation, the optionee would present the call to Ira Haupt & Company ("Haupt"), the endorser,[7] which then notified Reinach that Haupt had contracted on his

1. 24 CCH Tax Ct.Mem. 1605 (1965).

2. They are copyrighted and issued by the Put and Call Brokers & Dealers Association, Inc.

3. The put and call market is highly specialized; as of 1959, there were less than 15 active broker-dealer firms and under 600 writers. See SEC, Report on Put and Call Options ("Report") 54, 63 (1961).

4. For further details of the put and call market, see generally Report.

5. I. e., apart from taking some additional position in the stock on which the option is written.

6. It is of incidental interest that in this respect, Reinach differed from most writers, 80% of whom were long on calls they wrote. Report 57 (1959 figure); Record, pp. 32–33.

7. Reinach had been an employee and then partner at Haupt in the period 1946–1956. He maintained regular trading accounts with the firm in addition to using it as his regular option endorser.

account to deliver shares to the optionee. At the same time, Haupt would collect the option price for the stock from the optionee, and credit it to Reinach. On 96 of the 122 occasions when calls were exercised, Reinach ordered Haupt, as his broker, to purchase immediately shares in the market to cover those Haupt had bound itself as endorser to deliver to the optionee. But on 26 occasions, Reinach departed from his usual course of not taking a position in the stock involved in an option and he "went short" the stock called. In other words, he entered a short sale arrangement with his broker Haupt whereby Haupt agreed that Reinach did not have to replace immediately the stock it had delivered to the optionee. Eventually, Reinach purchased equivalent stock in the market to "cover" the short sale, i. e., repay Haupt for the loan of stock. Seven of such short sale transactions culminated on December 28, 1959; although one brought Reinach a profit, the eventual purchase price Reinach paid [8] on the other six was in excess of the original premium and striking price Reinach had received from the call optionee. It is Reinach's contention that for tax purposes this difference is his net loss and that his total net losses on the transactions of over $59,000 are ordinary losses. What is actually involved can be illustrated better by an example, one of the seven transactions in this appeal.

On December 20, 1957, taxpayer wrote a six month and ten day [9] call on 100 shares of Polaroid. He received a $650 premium. On May 26, 1958, the call was exercised. Haupt delivered the stock to the optionee, leaving Reinach at that point short 100 shares to Haupt; Reinach received the net option or striking price of $4,627.65. In other words, the net striking price was about $46.28 per share.[10] We can infer from the exercise of the option that the stock was selling at more than the striking price on May 26, 1958. If it was selling for less than $52.77, Reinach would have made a profit had he immediately purchased stock to repay Haupt, since he had received a total consideration of $5,277.65 (premium of $650 for writing the option plus striking price of $4,627.65), approximately $52.77 per share. However, the record does not disclose what the market price of Polaroid was on that date, so we cannot tell how taxpayer then stood. As he explained, Reinach considered that the price of Polaroid would soon decline and therefore decided not to close out the call transaction by buying stock to repay Haupt; instead he extended it by remaining short. In brief, taxpayer was taking a new speculative position in this stock, one which was to extend far beyond that involved in the option he had written. Finally, one year and seven months later on December 28, 1959, taxpayer bought stock to cover this short sale.[11] But by then the cost of shares equivalent to the 100 he had borrowed had risen to $18,432.38, or $184.32 per share. In addition, he owed Haupt $239.75 for dividends earned during the short sale period, another $2.40 per share. For tax purposes, Reinach considered that the event requiring recognition of loss was the purchase of stock to cover the short sale. In computing the loss, he added the premium and striking price he had received in 1958 ($5,277.65) and subtracted his cost items, the cover price in 1959 and dividend

8. Plus dividends which had been earned on the stock in the short sale period; Reinach also owed Haupt these dividends declared while the shares were "loaned" to him.

9. The 10 days beyond 6 months are designed to enable the optionee to establish a long-term capital gain, as taxpayer himself has pointed out. A. Reinach, An Introduction to the Option (Put and Call) Business 7 (1959); Report 26.

10. The actual striking price was $46.75/share, but for purposes of this example all figures are net of dividends, commissions, etc., as they appear in the Tax Court chart in its findings of fact.

11. The stock was not delivered until January 4, 1960, forming the basis of the second issue on appeal—in which year the loss was incurred.

expense ($18,432.38 + $239.75 = $18,-672.13). He thus reported a loss of $13,394.48. Reinach handled the other five loss transactions in a similar manner.

The Commissioner has no objection to the items in taxpayer's computations; he agrees that it was proper to consider an option and short sale a single transaction remaining open until the cover stock was acquired. Where the Commissioner and taxpayer differ is in their characterization of the transactions and the losses as capital or ordinary. Both taxpayer and the Commissioner rely on section 1221(1) of the Int.Rev.Code of 1954,[12] which defines a capital asset as follows:

> For purposes of this subtitle, the term "capital asset" means property held by the taxpayer (whether or not connected with his trade or business), but does not include—

> > (1) stock in trade of the taxpayer or other property of a kind which would properly be included in the inventory of the taxpayer if on hand at the close of the taxable year, or property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business; * * *.

Section 1233(a) of the Code deals specifically with short sales and provides:

> (a) Capital assets.—For purposes of this subtitle, gain or loss from the short sale of property, other than a hedging transaction in commodity futures, shall be considered as gain or loss from the sale or exchange of a capital asset to the extent that the property, including a commodity future, used to close the short sale constitutes a capital asset in the hands of the taxpayer.

It is thus apparent that the definition of capital asset in section 1221 controls the tax effect of a short sale under section 1233. Taxpayer claims that the way he conducted his occupation of writing puts and calls constituted a trade or business and that he had customers, the persons for whom he performed the service of writing options and meeting his obligations on them, brokers in the former and the public in the latter. Taxpayer goes on to argue that he purchased stock for only one reason—for sale to customers in the ordinary course of his business. Section 1221(1). Thus, he claims that since he only held stock for sale to customers, the stock involved in covering each short sale was not a capital asset, and he is entitled to ordinary loss treatment. Section 1233(a).

Alternatively, taxpayer relies on Corn Products Ref. Co. v. Commissioner of Internal Revenue, 350 U.S. 46, 76 S.Ct. 20, 100 L.Ed. 29 (1955). There the Court affirmed a judgment for the Commissioner, holding under a previous statute that dealings in grain futures by a grain products manufacturer not for speculation, but as "an integral part of its business designed to protect its manufacturing operations against a price increase in its principal raw material and to assure a ready supply for future manufacturing requirements," were not capital transactions, being so intimately related to the company's normal business. Id. at 50, 76 S.Ct. at 23. Thus, taxpayer contends that his acquisitions of stock were infrequent but integral to his true business of writing options. Taxpayer and the Commissioner agree that when an option is not exercised, a writer must declare the premium as ordinary income. In taxpayer's case, less than thirty per cent of the options he wrote were exercised, making the bulk of his gains taxable as ordinary income. Yet, when an option is exercised, the Commissioner insists that gain or loss must be treated as capital because the purchase or sale of stock is involved. Thus, all the losses taxpayer incurs in writing options must be capital ones. Taxpayer argues that the *Corn Products* doctrine ought to save him from this fractionalization of his business.

---

12. Hereinafter referred to by section only.

■■ There is surface appeal to taxpayer's argument that he ought not be required to pay tax on ordinary income for gains yet incur capital losses for two aspects of essentially the same business, the occasions for loss—exercise of options—occurring only because his market prognosis was less accurate.[13] But that is not the case before us. We have seven instances where Reinach honored a call option by borrowing from Haupt the stock to be delivered to the optionee. Then after periods ranging from a minimum of one year seven months to three and one-half years later, Reinach covered the loans with stock purchases leading in six instances to losses. Whatever we might think about stock bought to honor a call or disposed of following a put within a few days after their exercise, we do not consider stock borrowed for one and one-half to three and one-half years thereafter to have been "held by the taxpayer *primarily* for sale to customers * * *." Section 1221(1). (Emphasis added.) See Malat v. Riddell, 383 U.S. 569, 572, 86 S.Ct. 1030, 16 L.Ed.2d 102 (1966) (per curiam). Reinach argues on appeal that the object of his business of writing stock options was to earn a fee and that he "did not intend to either buy or sell stock except as required to fulfill options which he wrote." But it is apparent that Reinach sold the stock short not "primarily" to pay off the call optionee—he could easily have done that, as he usually did, by immediately covering the loan of stock to him from Haupt. Reinach went short for a purpose entirely divorced from his put and call writing. He did it for the same reason an ordinary trader might have—because he anticipated a decline in the stock's price. Traders in securities receive capital gain and loss treatment. E.g., Commissioner of Internal Revenue v. Burnett, 118 F.2d 659 (5th Cir. 1941); see 3B Mertens, Federal Income Taxation § 22.153 (rev. ed. 1966). When Reinach persisted in his decision to go short for such lengthy periods of time rather than covering immediately, it could not longer be said [14] that the stock he sold short was held primarily for sale to any alleged customer. Reinach made his choice to keep the transaction open; that implied a parallel choice to transform this transaction from the ordinary exercise of an option into a short sale extending over a period of many months or even years. Indeed, he had much to gain thereby. He could have controlled the year in which gain or loss was recognized and might have been able to cut his losses if the market had declined for a particular stock. If one or more of the transactions thus eventually turned out to be profitable, he would have been entitled to consistent capital treatment so that capital losses could have offset the gain.

It needs little further elaboration to show that *Corn Products* is similarly no comfort to taxpayer. It suffices to say that *Corn Products* does not protect transactions essentially not related to the taxpayer's principal business, upon which he is taxed at ordinary rates.

The second question raised on appeal—when Reinach's losses occurred—is only significant in relation to the amount of loss taxpayer could claim as an ordinary loss carryback to 1956. See section 172. Since we have held that Reinach's losses were capital, like the Tax Court, we need not reach this issue.

Affirmed.

13. Of course, there are other countervailing considerations taxpayer has largely ignored. A writer, though he does not own the stock, may profit even when a call option is exercised; e. g., if he received a $200 premium for a call on 100 shares at a striking price of $800 ($8/share), if the stock is selling at $9/share the option will be exercised, but the writer will profit $100, assuming he buys the shares in the open market for $900. Here, he will get capital gain treatment on his profit. Rev.Rul. 58–234, 1958–1 Cum.Bull. 279. Moreover, if Reinach's short sales involved in this case had been profitable, he would have received capital gain treatment—as indeed he did on the one transaction that showed a profit.

14. Assuming *arguendo* that at one point it could.