MARLOWE KING, PETITIONER v. COMMISSIONER OF
INTERNAL REVENUE, RESPONDENT

Docket No. 15350-84.     Filed September 9, 1987.

*Stephen Lewis, Bradford Ferguson, Frederick Hickman, Peter Freeman,* and *Michael Clark,* for the petitioner.
*Judy Jacobs* and *Alan Jacobson,* for the respondent.

CLAPP, *Judge*: Respondent determined deficiencies in petitioner's Federal income taxes as follows:

| Year | Deficiency |
|------|------------|
| 1979 | $19,989.34 |
| 1980 | 1,525,852.76 |

Following the granting of petitioner's motion for partial summary judgment in *King v. Commissioner*, 87 T.C. 1213 (1986), the only issue remaining for our decision is whether section 163(d) [1] is applicable to certain interest deductions claimed by petitioner for the years in issue.

### FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulation and attached exhibits are incorporated herein by this reference. Petitioner resided at Highland Park, Illinois, at the time the petition herein was filed.

### *Background*

Petitioner is a registered member of the Chicago Mercantile Exchange (CME), a domestic board of trade designated as a contract market by the Commodity Futures Trading Commission. Petitioner is also a member of the International Monetary Market (IMM), a division of the CME, and has been a member of the IMM since its establishment in 1972. From approximately 1954 through 1985, petitioner was also a member of the Chicago Board of Trade (CBOT).

Petitioner has spent his entire business career in various aspects of the commodity futures business. Following his graduation from New York University in 1948, petitioner worked in New York for 2 years for two firms dealing in butter and eggs, and cheese, respectively. Since 1950, when petitioner moved to Chicago and purchased a seat on the CME, his principal source of income has been the trading of regulated futures contracts on the CME, IMM, and CBOT. Petitioner engaged in such trading from 1950 to the present. In the 1950's, petitioner principally traded egg and onion futures. Petitioner began trading pork belly and live cattle futures in the early 1960's, and also traded futures

---

[1] Unless otherwise indicated, all section references are to the Internal Revenue Code as amended and in effect during the years in issue.

for hogs and feeder cattle at various times. After the IMM was established, petitioner also began trading foreign currency, gold, and Treasury bill futures.

Until 1968, in addition to trading for his own account, petitioner also acted as a broker. In 1962, petitioner and his brother established King & King, Inc., which engaged in brokerage and in trading for speculation. King & King is a clearing member of the CME and IMM (i.e., a member of the CME Clearing House which the CME organization established to guarantee performance of and provide for settlement of all contracts traded on the CME) and clears petitioner's trades and the trades of a few other customers. In 1979 and 1980, petitioner was the president and sole shareholder of King & King. Since 1968, petitioner has traded primarily for his own account.

### Petitioner's Daily Exchange Activities

Petitioner monitors the trading on the CME and IMM on a regular basis on most days that the exchanges are open for trading. Since 1975, petitioner has not conducted his trading activity on the trading floor. Rather, he monitors trading through television screens in his offices and Highland Park home, and telephones instructions to King & King for execution by floor brokers. During the years in issue, petitioner had an office in Palm Springs, California, and an office in King & King's offices in Riverside Plaza in Chicago.

Petitioner normally spends approximately 6 hours per day on trading and activities related to his trading. Petitioner normally arrives in his office 1 hour before the opening of the futures markets. He ordinarily calls a consultant to discuss information on the cash markets for the commodities he is trading. Petitioner also customarily consults with a clerk on the CME floor to obtain any statistics published by the CME. Petitioner also, if possible prior to the opening of the markets, calls to consult other traders around the country with whom petitioner is acquainted and who, like petitioner, trade on the basis of supply and demand.

Once the futures markets on the CME open, petitioner continually monitors the activity, via a television screen, in markets in which he has positions. The television screen

shows petitioner the last sales price, the high and the low for the particular commodity, as well as news events. If petitioner wishes to place an order, he calls his 800 number for the King & King Chicago office and instructs the clerk to place an order with a floor broker. Once the order is filled, a King & King runner telephones petitioner with the confirmation of the trade. Petitioner monitors the activities on the CME until the exchange closes. Following the close of trading, he ordinarily telephones a consultant to obtain information on closing market prices and other information on deliveries.

During the period 1978 through 1980, petitioner maintained nine trading accounts with King & King for trading futures contracts traded on the CME. In addition, petitioner maintained accounts with Rosenthal & Co. and Marc Commodities for trading futures contracts traded on the CBOT and the New York Mercantile Exchange, respectively. During the taxable years in issue, petitioner traded, with varying degrees of frequency, in futures contracts for 20 different commodities, including gold, Swiss francs, Japanese yen, Canadian dollars, British pounds, Mexican pesos, Treasury bills, Deutschemarks, lumber, broiler chickens, live hogs, live cattle, feeder cattle, frozen pork bellies, eggs, wheat, corn, soybeans, GNMA collateralized deposit receipts, and potatoes.

## General Elements of Commodity Trading

A commodity futures contract is an executory contract representing a commitment to deliver or receive a specified quantity and grade of a commodity during a specified month in the future at a price designated by the trading participants. One who commits to deliver pursuant to a futures contract is commonly referred to as a "seller." A seller is said to have a "short" position in the futures market. Opposite the seller in the execution of every futures contract is one who commits to receive pursuant to a futures contract, commonly referred to as a buyer. A buyer is said to have a "long" position in the futures market.

A futures contract may be satisfied either by offset—acquisition of an equal and opposite futures position to the position previously held—or by making or receiving delivery

of the physical commodity required to be delivered or received under the futures contract. Futures and physical prices are inextricably linked at all times through the ability of a trader holding futures contracts to make or insist on receiving delivery. Most professional traders will at one time or another be involved in deliveries and in the ownership of physical commodities. From the standpoint of the professional trader, the physical commodity market, or "cash market," is part and parcel of the futures market.

Trading in a futures contract for a particular commodity and delivery month may begin as much as 2 or more years prior to the delivery month, while delivery pursuant to the contract can only occur during the delivery month. Ninety-seven to ninety-nine percent of futures contracts are satisfied through offset, rather than delivery. However, if a contract is held to the delivery month, it is more than likely that the contract will be satisfied by delivery rather than offset. Every delivery month entails varying quantities delivered against the expiring contract, and, in terms of the means of satisfaction of futures contracts once the designated delivery month has arrived, delivery is commonplace.

When a trader accepts delivery under a futures contract, he is required to pay in cash the delivery price. The cash outlay required to hold the physical commodity is substantially more than the cash outlay required for holding a futures contract, which may be held on margins as little as 5 or 10 percent of the total price of the contract. As a result, when a professional trader takes delivery pursuant to a futures contract, the trader will ordinarily find it necessary to borrow money to pay the delivery price.

*Commodities Futures Trading During Years in Issue*

Petitioner employed a "fundamentalist" approach to trading, acquiring positions and holding them for varying lengths of time depending upon his view of supply trends in the cash market and the impact of such supply on cash and futures prices. Petitioner did not employ a "charting" approach—disposing of or acquiring a position based on market movement in comparison with historical price trends—or a "scalping" approach—rapidly trading positions based on market movement from the volume of bids coming

into the pits. Petitioner frequently adjusted his positions in response to his assessment of supply trends and market conditions and traded substantial numbers of contracts in each year in issue. In 1979, petitioner closed through offset 11,040 futures contracts. In 1980, petitioner suffered a heart attack and traded fewer contracts, but still closed 6,711 contracts through offset.

In addition to the delivery of gold described *infra*, petitioner took delivery of other physical commodities under the terms of regulated futures contracts during the years 1979 and 1980. During these years, petitioner took delivery under 34 futures contracts for feeder cattle, live cattle, and pork bellies, and held these commodities for varying periods of time ranging from a few hours to 26 days. In some cases, petitioner effected disposition of these commodities by redelivering them in satisfaction of a short CME futures contract for the current delivery month, and, in other cases, disposition was effected by selling the commodity to a purchaser in a transaction off the exchange.

Petitioner also made off-exchange purchases of various quantities of 30-pound cans of salt egg yolks and various quantities of frozen boneless beef trimmings during the year 1978. Petitioner held these physical commodities for periods as long as 8 months before selling such commodities. Petitioner made no off-exchange purchases during 1979 or 1980. Other than the one gold acquisition at issue in this case, petitioner never took delivery of or purchased gold, silver, or any other precious metal.

Petitioner normally financed his holdings of physical commodities through borrowing. During the years in issue, petitioner had available for use a $5 million to $10 million line of credit from Harris Trust.

*Gold Straddle Trading Strategy*

A commodity straddle is a trading vehicle that involves a combination of a "long" market position (i.e., actual owner-ship of a commodity or a contract obligation to buy a commodity) and a "short" market position (i.e., a contract obligation to sell a commodity) in which the long and short positions relate to different time periods. Typically, the long positions and short positions will be affected in opposite

(but not equal) ways by market movements, so that a gain on the long position will be approximately balanced by a loss on the short position, and vice versa. Therefore, holding positions as part of a straddle substantially diminishes the risk that would be involved if the long or short positions were held separately. But risk remains in most straddles, as the countervailing market movements are rarely identical, and there is a corresponding opportunity to profit from most straddles if transaction costs are not considered.

Futures straddles (more commonly known as spreads) are established by buying a regulated futures contract for one delivery month in a commodity (a long position) and selling a contract in the same commodity for a different month (a short position). In trading straddles, a trader is concerned with changes in the difference between the price of each position comprising the straddle. Gold price spreads at all times closely reflect short-term interest rates. Gold is continuously in ample supply and incurs trivial storage costs. This means that the cost of carry in its futures markets is simply the interest foregone over the holding period from one delivery month to a later one. Thus, if a trader knows today's gold price and the prime rate of interest, he can predict the price spreads between futures delivery months to a very close approximation. Therefore the risk in a simple spread position in gold futures derives from the prospect of any change in interest rates or in the price level of gold. In general, these risks are not great over short-time intervals, but in periods of interest rate volatility or gold price volatility they can be significant.

In general, if gold prices are increasing, prices for distant delivery months can be expected to increase more than prices for nearby months. Thus, if a rising market is anticipated, a straddle consisting of a short contract for the nearby month and a long contract for the more distant month should produce a profit.

Carrying costs consist of the cost of borrowing money (i.e., interest) to take possession of the actual commodity and the cost of storing the commodity. As those costs increase, the cost of taking delivery of gold and holding it for future use also increases, producing a similar increase in the price of contracts for distant delivery months relative to

the price of contracts for nearby months. A rise in interest rates will thus tend to result in profits in a straddle where the straddle is short the nearby month and long the faraway month. Also, conversely, if interest rates fall, a trader will tend to profit if he is long the nearby month and short the distant month.

For a commodity such as gold, where there are adequate supplies of the commodity and sufficient storage capacity, the futures price for that commodity will have a definite relationship to the current price for purchasing the underlying physical commodity (the cash price). The futures price will tend to exceed the cash price of gold or similar commodities by approximately the amount of the cost of carrying the commodity from the time of the purchase of the physical commodity until the time for delivery under the futures contract.

A cash and carry transaction involves the acquisition of a physical commodity (a long position in the commodity) and the holding of a short futures contract to sell that commodity at some future time (a short position in the commodity). A spread position between the physical commodity and a futures contract is identical to a futures-futures spread except that the long position is in the physical commodity and the short position is in futures. A futures spread in which the long side is nearby and the short side is distant becomes a cash-futures (physical-futures) spread when the nearby month becomes the spot (present) month. This is inherent in the terms of a futures contract.

It is particularly easy for traders involved in the gold market to be involved in deliveries, and, consequently, in cash-futures gold spreads. Gold is easily and cheaply held in vaults for storage and is not subject to storage congestion or movement congestion, as are grains or other bulk commodities. Gold taken on delivery in satisfaction of a futures contract is also easier to hold for long periods of time than perishable commodities, such as live cattle or eggs, which are costly to hold beyond the delivery period and are ordinarily resold promptly. Wheat or soybeans involve substantial storage costs compared to gold, and the price of such commodities for later future delivery months

may not fully reflect the carrying charges. In contrast, gold received in delivery can be held for considerable periods because the cost of carrying (interest on the funds borrowed to acquire the physical gold) will ordinarily be reflected in prices for later delivery.

While futures-futures spreads and cash-futures spreads are dictated by the same forces, i.e., interest rate changes and gold price changes, their behavior over time differs in one respect. Two futures contracts which are 60 days apart will always be 60-days interest apart. But a physical position which is 60 days from the delivery month, by virtue of being deliverable in 60 days, converges to the same price as that futures contract. This means that such a position may be profitably closed out if there is a sudden narrowing in the spread due to a drop in interest rates and/or a drop in gold prices. On the other hand, it can be carried to delivery guaranteeing the existing spread and is not subject to losses from any widening in spreads. This elimination of the possibility of loss entails a cost, i.e., the interest cost of owning physical gold.

One who has a cash and carry position, owning physical gold against short futures, can make a profit by closing out the position if the spread falls below the convergence trend line to zero spread. He in effect can thus earn carrying charges at a faster rate than that which was assured when he entered the position. Alternatively, if he can borrow at a lower interest rate than that reflected in gold spreads, he can loan to the gold futures market at the higher rate reflected in the spread.

The futures-futures spreader, on the other hand, if he takes a bear spread position—such as that reflected in a cash and carry position—can profit to the full extent that the spread narrows but will lose to the full extent that it widens. His front futures position never converges to his back futures position, so he has no backstop against losses from widening spreads.

### IMM Gold Trading Mechanics and Transaction Costs (1978-80)

The minimum price fluctuation for the IMM gold contract, consisting of 100 troy ounces of gold no less than .995 fine,

was $0.10 (10 points) per fine troy ounce, or $10 per contract (100 troy ounces multiplied by $0.10 per contract). IMM gold contracts are traded for the delivery months of March, June, September, and December for up to approximately 2 years from the date of trading. In addition, contracts for January, February, April, May, July, August, October, and November may be traded during the delivery month.

Because of King & King's status as a clearing member of the CME and IMM, petitioner paid no clearing member fees on execution of his trades. Also, petitioner paid no floor brokerage commissions or exchange fees with respect to his trades. Instead, King & King paid these charges and did not pass them on to petitioner. Had petitioner incurred such fees, the floor brokerage commissions would have been $1.75 per trade per contract ($3.50 per roundturn trade[2] per contract), and exchange fees would have been $0.25 per trade ($0.50 per roundturn trade per contract). Total roundturn commission and exchange fees per contract would thus have been $4, had petitioner paid such fees.

### 1978-80 Cash and Carry Straddle

On December 4, 1978, petitioner acquired 10,000 ounces of gold. This acquisition of the cash gold commodity was effected by taking delivery of warehouse receipts representing ownership of gold under 100 long gold futures contracts, which called for delivery in December 1978 at a price of $211.10 per ounce. On the day petitioner took delivery of the gold, settlement prices for futures contracts for gold delivery months in 1980 were as follows:

| Month | Price |
|---|---|
| March | $224.20 |
| June | 230.00 |
| September | 236.70 |
| December | Contract not available |

Under the CME rules, the actual delivery price is set at the settlement price on the day the seller provides notice to the CME Clearing House, rather than at the price at which the trader initially acquired the long futures contract. The

---

[2] A roundturn trade consists of entering into a futures contract (long or short) and subsequently entering into an offsetting short or long contract to close the transaction.

settlement price is further adjusted for premiums and discounts resulting from grade and quantity variations and from storage, insurance, and other miscellaneous charges. With respect to petitioner's acquisition of gold, the relevant seller provided notice to the Clearing House on November 30, 1978, and the settlement price on that date for December 1978 gold was $192.90 per ounce. The adjustments under CME rules resulted in an increase in the delivery price to $192.916517 per ounce for a total delivery price of $1,929,165.17 for the 10,000 ounces of physical gold.

Petitioner paid the $1,929,165.17 delivery price on December 4, 1978, and received, on that date, warehouse receipts signifying his ownership of the 10,000 ounces of gold. To finance the gold acquisition, petitioner borrowed the $1,929,165.17 delivery price from the King & King, Inc. Profit Sharing Plan and Trust on December 4, 1978. On that date, petitioner executed a promissory note in the amount of the loan due December 4, 1979, with simple interest at 12 percent per annum. On December 4, 1979, the first note was replaced by a second promissory note (due December 4, 1980) with simple interest at 15½ percent per annum. On May 5, 1980, the $1,929,165.17 principal amount of the second note was paid in full. The total interest paid on the indebtedness incurred to purchase the physical gold was $231,499.84 in 1979 and $124,591.92 in 1980, for a total interest cost of $356,091.76.

The gold was stored in four locations: Chase Manhattan Bank, N.A., New York, New York; Citibank, N.A., New York, New York; The First National Bank of Chicago, Chicago, Illinois; and Continental Bank, Chicago, Illinois. Petitioner's total carrying costs incurred to hold the gold were $356,091.76 interest plus $6,382.10 storage costs, or $362,473.86. Other than the interest and storage costs described above, petitioner incurred no transaction costs or carrying costs with respect to the acquisition and carrying of the 10,000 ounces of physical gold.

On May 5, 1980, petitioner disposed of the 10,000 ounces of gold by delivering the warehouse receipts to the CME Clearing House in satisfaction of his delivery obligation under 100 short gold futures contracts acquired on May 1,

1980, which called for May 1980 delivery at a price of $481 per ounce.[3] As noted above, the actual delivery price is set at the settlement price on the day the seller provides notice to the Clearing House, with adjustments for premiums and discounts resulting from grade and quantity variations, storage, maintenance, and other miscellaneous charges. Petitioner gave notice of delivery on May 1, 1980, and the settlement price for May 1980 gold futures was $516 per ounce on that date. The adjustment indicated above increased this price to $516.0259 per ounce, for a total delivery price of $5,160,259.

## OPINION

Our only issue for decision is whether the amounts of $231,499.84 and $124,591.92 paid by petitioner as interest in 1979 and 1980, respectively, are subject to the limitations of section 163(d).[4]

As relevant to this case, section 163(d) restricts the deduction of "investment interest" otherwise allowable as a deduction to the amount of $10,000 plus the amount of net investment income. Investment interest is defined as "interest paid or accrued on indebtedness incurred or continued to purchase or carry property *held for investment.*" Sec. 163(d)(3)(D) (emphasis added). Petitioner argues that he was engaged in the trade or business of commodities trading and that the gold transaction here in issue was a part of that trade or business. Petitioner concludes that because the gold was held as a part of his trade or business, it was not held for investment within the meaning of section 163(d).

---

[3]In our earlier opinion, we stated that petitioner disposed of the gold on May 2, 1980. The parties have now stipulated that the disposition occurred on May 5, 1980. This discrepancy is not relevant to our decision herein.

[4]The statutory notice of deficiency issued by respondent to petitioner disallowed the interest expense claimed by petitioner in 1979 to the extent of $149,175.34 pursuant to sec. 163(d). The disallowed 1979 interest was allowed by respondent in 1980 along with the interest incurred to carry the gold in 1980. Sec. 163(d)(1) allows investment interest only to the extent of $10,000 plus investment income, but sec. 163(d)(2) permits the carryover of disallowed investment interest. In the notice of deficiency respondent had determined that the gain from closing the short sale with gold was net short-term capital gain (which qualifies as investment income) rather than long-term capital gain (which does not qualify as investment income). Therefore, respondent allowed the above interest amounts in 1980. In our earlier opinion, we determined that petitioner's gain in 1980 was long-term capital gain. As a result, the interest deductions allowed by respondent in 1980 are now in issue.

Respondent has not contested that petitioner's *futures* trading activities qualify as a trade or business. On the other hand, respondent argues that petitioner was not in the trade or business of trading physical commodities and that such trading, or at least the gold transaction here in issue, was not a part of his trade or business of trading futures.

One who regularly buys and sells on an exchange may be either a dealer or a trader. In this regard, we have stated,

Those who sell "to customers" are comparable to a merchant in that they purchase their stock in trade, in this case securities, with the expectation of reselling at a profit, not because of a rise in value during the interval of time between purchase and resale, but merely because they have or hope to find a market of buyers who will purchase from them at a price in excess of their cost. This excess or mark-up represents remuneration for their labors as a middle man bringing together buyer and seller, and performing the usual services of retailer or wholesaler of goods. * * * Such sellers are known as "dealers."

Contrasted to "dealers" are those sellers of securities who perform no such merchandising functions and whose status as to the source of supply is not significantly different from that of those to whom they sell. That is, the securities are as easily accessible to one as the other and the seller performs no services that need be compensated for by a mark-up of the price of the securities he sells. The sellers depend upon such circumstances as a rise in value or an advantageous purchase to enable them to sell at a price in excess of cost. Such sellers are known as "traders."

[*Kemon v. Commissioner*, 16 T.C. 1026, 1032-1033 (1951); citations omitted.]

As a result of Congress' amending the predecessor of section 1221 (sec. 117 of the Revenue Act of 1934), traders, as opposed to dealers, occupy an unusual position with respect to the tax laws. Traders may engage in a trade or business which produces capital gains and losses rather than ordinary income and losses. The history behind this anomaly was explained in *Wood v. Commissioner*, 16 T.C. 213, 219-220 (1951),

Prior to 1934, a trader, as distinguished from a dealer, in securities was taxable on the gains derived from his trading activities in the same manner as the gains of dealers in securities, namely, as ordinary income. Such gains were excluded from the operation of the capital gains provisions of the statute because "capital assets" were defined as not including "property held by the taxpayer primarily for sale in the course

of his trade or business." In 1934 Congress amended section 117 for the purpose of treating certain transactions in securities as transactions in capital assets in order that losses incurred in these transactions could not be deducted in full. * * * In the Revenue Act of 1934 Congress sought to accomplish this * * * result by amending the definition of "capital asset" in the new section 117 so as to exclude, not *all* property held primarily for sale in the course of business, but only such property as was held primarily for sale "to customers" in the "ordinary" course of business. Since the sale on a securities exchange is not usually considered to be a sale "to customers," it was asserted that this amendment made it "impossible to contend that a stock speculator trading on his own account is not subject to the provisions of Section 117" [H. Conf. Rept. 1385, 73d Cong., 2d Sess. 22 (1934)]—or, to state it in the positive, that a stock speculator trading on his own account would be subject to capital gain and loss treatment under section 117, as so amended. See *Francis Shelton Farr*, 44 B.T.A. 683 (1941). [Fn. refs. omitted; emphasis in original.]

As a result, a primary distinction for Federal tax purposes between a trader and a dealer in securities or commodities is that a dealer does not hold securities or commodities as capital assets if held in connection with his trade or business, where as a trader holds securities or commodities as capital assets whether or not such assets are held in connection with his trade or business.[5] A dealer falls within an exception to capital asset treatment because he deals in property held primarily for sale to customers in the ordinary course of his trade or business. A trader, on the other hand, does not have customers and is therefore not considered to fall within an exception to capital asset treatment.

The distinction between a "trader" and an "investor" also turns on the nature of the activity in which the taxpayer is involved. A trader seeks profit from short-term market swings and receives income principally from selling on an exchange rather than from dividends, interest, or long-term appreciation. *Groetzinger v. Commissioner*, 771 F.2d 269, 274-275 (7th Cir. 1985), affd. 480 U.S. ___ (1987); *Moller v. United States*, 721 F.2d 810, 813 (Fed. Cir. 1983). Further, a trader will be deemed to be engaged in a trade or business if his trading is frequent and substantial. *Groetzinger v.*

---

[5]The same capital treatment to which traders in securities are subject has also been held applicable to traders of commodity futures. *Commissioner v. Covington*, 120 F.2d 768 (5th Cir. 1941), affg. on this issue 42 B.T.A. 601 (1940); *Vickers v. Commissioner*, 80 T.C. 394, 405 (1983).

*Commissioner, supra* at 275; *Fuld v. Commissioner,* 139 F.2d 465 (2d Cir. 1943), affg. 44 B.T.A. 1268 (1941). An investor, on the other hand, makes purchases for capital appreciation and income, usually without regard to short-term developments that would influence prices on the daily market. *Groetzinger v. Commissioner,* 82 T.C. 793, 801 (1984), affd. 771 F.2d 269 (7th Cir. 1985), affd. 480 U.S. ___ (1987); *Liang v. Commissioner,* 23 T.C. 1040, 1043 (1955). No matter how extensive his activities might be, an investor is never considered to be engaged in a trade or business with respect to his investment activities. *Higgins v. Commissioner,* 312 U.S. 212, 216, 218 (1941); *Groetzinger v. Commissioner,* 771 F.2d at 275.

Petitioner clearly was in the trade or business of trading commodity futures during the years in issue.[6] Petitioner's trading was frequent and substantial but he traded solely for his own account during the years in issue and neither had customers nor performed services analogous to those performed by a merchant.[7] The parties appear to agree that petitioner was in the trade or business of trading commodities futures.[8]

---

[6]We note that in our earlier opinion, relating to petitioner's motion for partial summary judgment, we stated that the parties were in agreement that "petitioner was a dealer in commodities within the meaning of Section 108(f)" of the Tax Reform Act of 1984 (Division A of the Deficit Reduction Act of 1984, Pub. L. 98-369, 98 Stat. 494, 630), as amended by sec. 1808(d) of the Tax Reform Act of 1986. Sec. 108(f), as amended, provides in relevant part "For purposes of this section, the term 'commodities dealer' means any taxpayer who— (1) at any time before January 1, 1982, was an individual described in section 1402(i)(2)(B)." Sec. 1402(i)(2)(B) defines, for purposes of sec. 1402(i) a commodities dealer as "a person who is actively engaged in trading section 1256 contracts and is registered with a domestic board of trade which is designated as a contract market by the Commodities Futures Trading Commission." A sec. 1256 contract is defined as including "any regulated futures contract." Sec. 1256(b)(1).

Petitioner was a registered member of the CME, a domestic board of trade designated as a contract market by the Commodity Futures Trading Commission, and was actively engaged in trading regulated futures contracts. Therefore, pursuant to sec. 108(f), petitioner was a commodities dealer for purposes of sec. 108 of the Tax Reform Act of 1984, as amended by sec. 1808(d) of the Tax Reform Act of 1986. This status as a commodities dealer, however, applies solely for purposes of sec. 108 and does not, for any other purpose, affect petitioner's status as a trader who is not a dealer. See H. Rept. 99-426, at 911 (1985).

[7]Until 1968, petitioner acted as a broker as well as trading for his own account. At that time, petitioner may have been a dealer with respect to futures contracts, but this is not relevant to the years in issue.

[8]We also note that sec. 108(a) and (b) of the Tax Reform Act of 1984, 98 Stat. 630, as amended by sec. 1808(d) of the Tax Reform Act of 1986, 100 Stat. 2817-2818, provides,

SEC. 108(a). GENERAL RULE.-For purposes of the Internal Revenue Code of 1954, in the case of any disposition of 1 or more positions—

(1) which are entered into before 1982 and form part of a straddle, and

(2) to which the amendments made by title V of such Act do not apply,

Based on the above, we are faced with the unusual situation of a taxpayer engaged in a trade or business which produces capital gains and losses. The application of section 163(d) to such a taxpayer has been presented by the parties as a novel issue.

Initially, respondent argues that petitioner's holding of the physical gold was subject to the provisions of section 163(d) whether or not such property was held in connection with petitioner's trade or business. Respondent argues that this conclusion necessarily follows from both the legislative history of section 163(d), as well as from this Court's opinion in *Miller v. Commissioner*, 70 T.C. 448 (1978).

The legislative history of section 163(d) describes the abuse which Congress intended to curb by the enactment of section 163(d):

The itemized deduction presently allowed individuals for interest, makes it possible for taxpayers to voluntarily incur substantial interest expenses on funds borrowed to acquire or carry investment assets. Where the interest expense exceeds the taxpayer's investment income, it, in effect, is used to insulate other income from taxation. For example, a taxpayer may borrow substantial amounts to purchase stocks which have growth potential but which return small dividends currently. Despite the fact that the receipt of the income from the investment may be postponed (and may be capital), the taxpayer will receive a current deduction for the interest expense even though it is substantially in excess of the income from the investment. [H. Rept. 91-413 (Part 1)(1969), 1969-3 C.B. 200, 245.]

The House report also adds, however, that "interest on funds borrowed in connection with a trade or business would not be affected by the limitation."

Respondent argues that a trader such as petitioner makes purchases and incurs debt in order to earn income which will be postponed and capital, and that the assets purchased

---

any loss from such disposition shall be allowed for the taxable year of the disposition if such loss is incurred in a trade or business, or if such loss is incurred in a transaction entered into for profit though not connected with a trade or business.

(b) Loss Incurred in a Trade or Business.—For purposes of subsection (a), any loss incurred by a commodities dealer in the trading of commodities shall be treated as a loss incurred in a trade or business.

Based on the foregoing, we determined in our earlier opinion that certain short-term capital losses claimed by petitioner were allowable. Such losses were incurred by a commodities dealer within the meaning of sec. 108(f) (see note 6 supra), in the trading of commodities and were therefore to be treated as incurred in a trade or business for purposes of sec. 108(a). The character of such losses as capital losses, however, is not affected by their treatment as losses incurred in a trade or business for purposes of sec. 108.

by petitioner, unlike stock, produce no income of any type prior to disposition. Respondent concludes that petitioner's trading activities fall within the scope of the abuse described in the legislative history. As we previously stated, however, the primary characteristic which differentiates the activities of a trader from those of an investor is that a trader seeks short-swing gains while an investor seeks long-term appreciation. See *Liang v. Commissioner, supra* at 1043. As such, the general activities of a trader do not fit the description of the abuse described in the legislative history of section 163(d), i.e., investing for postponed income and current interest deductions. Further, the case law cited above distinguishes traders and investors. To the extent a trader is holding assets as part of his trading activities, he is not an investor and therefore does not hold property for investment. The statement in the legislative history that the limitations of section 163(d) are not to apply to "interest on funds borrowed in connection with a trade or business" is clear and unambiguous. From the above we conclude that section 163(d) does not apply to the extent a trader has incurred indebtedness in order to carry on ordinary trading activities as part of his trade or business.[9]

Nonetheless, respondent argues that this Court's holding in *Miller v. Commissioner, supra*, is controlling with respect to the application of section 163(d). In *Miller*, a partnership borrowed money to purchase a controlling interest in the stock of a bank. The taxpayer therein, a partner in the partnership and president of the bank, deducted his proportionate share of the interest incurred by the partnership on the loan used to purchase the bank's stock. Respondent determined that the interest should be treated as "interest paid or accrued on indebtedness incurred or continued to purchase or carry property held for investment."[10] The partnership reported the gains on sale of the bank stock as capital gains. In holding that the partnership's interest payments were made on indebtedness incurred or continued

---

[9] We express no opinion as to whether sec. 163(d) is applicable to property held as part of normal trading activities when such activities do not rise to the level of a trade or business.

[10] The actual issue in *Miller* related to whether such interest was an item of tax preference pursuant to the alternative minimum tax provisions. See sec. 57. In *Miller*, we found that sec. 57 and sec. 163(d) were enacted to deal with the same abuse and that, with respect to investment interest, such sections have the same scope. 70 T.C. at 454-455. See also S. Rept. 91-552 (1969), 1969-3 C.B. 423, 617; H. Rept. 91-413 (Part 1) (1969), 1969-3 C.B. 200, 245.

to purchase or carry property held for investment, we stated that—

section 57, like section 163(d), attempts to deal with an abuse which is present whenever interest is incurred to obtain or maintain property held with sufficient investment intent for the gain on its disposition to constitute capital gain. Such property is investment property and the interest on funds borrowed to finance its purchase is investment interest. We, therefore, must look to the stock purchased by [the partnership] with the borrowed funds to determine whether the stock was held with sufficient investment intent to make it a capital asset. [70 T.C. at 455.]

Our *Miller* decision neither involved nor considered the unusual situation of a trader of securities or commodities. Rather, our opinion therein dealt with a factual pattern in which the taxpayer attempted to argue the applicability of the doctrine put forth in *Corn Products Refining Co. v. Commissioner*, 350 U.S. 46 (1955). In reaching our conclusion in *Miller*, we noted statements made by this Court in *W.W. Windle Co. v. Commissioner*, 65 T.C. 694, 714 n. 15 (1976), that "stock is normally a capital asset" held for investment, and that only where the "original purpose of [the] acquisition and the reason for continued retention are both devoid of substantial investment intent should the stock be treated otherwise." *Miller v. Commissioner, supra* at 455.

Under the factual scenario in *Miller*, whether the taxpayer therein could properly claim capital gains treatment was synonymous with whether the taxpayer held the property for investment. See *Corn Products Refining Co. v. Commissioner, supra; W.W. Windle Co. v. Commissioner, supra.* A trader, on the other hand, receives capital gains treatment whether or not the property is held for investment or held in connection with his trade or business. As discussed *supra*, to the extent a trader holds property as part of his trade or business of trading, he receives capital gains treatment even though such property is not held for investment. Our holding in *Miller* is limited to the factual situation involved therein, i.e., a taxpayer attempting to prove that stock is not held for investment due to the application of the doctrine set forth in *Corn Products Refining Co. v. Commissioner, supra.*[11]

---

[11]To the extent respondent would argue that *Miller* establishes a per se rule that sec. 163(d) is applicable anytime interest is incurred to purchase or maintain property which upon disposition produces capital gains or losses, his argument must be rejected. Besides property

Accordingly, we find that to the extent a trader has incurred debt in order to carry on ordinary trading activities as part of his trade or business of trading, the interest paid thereon is not subject to the limitations of section 163(d).

We next consider whether the holding of the gold by petitioner should nonetheless be treated as the holding of property for investment either because petitioner was not engaged in the business of trading physical commodities or because this particular transaction was not a part of petitioner's trade or business.

Petitioner acquired the 10,000 ounces of gold on December 4, 1978, by taking delivery of warehouse receipts representing ownership of gold under 100 long gold futures contracts, which called for delivery in December 1978. On May 5, 1980, petitioner disposed of the 10,000 ounces of gold by delivering the warehouse receipts to the CME Clearing House in satisfaction of his delivery obligation under 100 short gold futures contracts which called for May 1980 delivery. On the date petitioner took delivery of the gold, he executed a note to the King & King, Inc. Profit Sharing Plan and Trust. This note was due on December 4, 1979, one year after its execution. On December 4, 1979, petitioner executed a second note with a due date of December 4, 1980.

In addition to the delivery of gold here in issue, petitioner took delivery during the years 1979 and 1980 under 34 futures contracts and held these commodities for varying periods of time ranging from a few hours to 26 days. In some cases, petitioner affected disposition of these commodities by redelivering them in satisfaction of a short CME futures contract for the current delivery month, and, in other cases, disposition was affected by selling the commodity to a purchaser in a transaction off the exchange. Petitioner also made off-exchange purchases of various commodities during the year 1978 and held these physical commodities for periods as long as 8 months. Petitioner made no off-exchange purchases during 1979 or 1980. Other

---

held by a trader as part of his trade or business of trading, personal use property receives capital treatment upon disposition even though such property is not held for investment. We do not believe that respondent would argue that sec. 163(d) should be applied, for example, to personal residences.

than the one gold acquisition at issue in this case, petitioner never took delivery of or purchased gold, silver, or any other precious metal.

Respondent directs our attention to statements of the Supreme Court in *Higgins v. Commissioner, supra,* in arguing that petitioner's dealings in physical commodities, or at least the gold transaction here in issue, can be separated out from petitioner's trade or business of trading in commodities futures. In *Higgins,* the taxpayer had extensive investment in real estate, bonds, and stocks, and devoted a considerable portion of his time to the oversight of his interests. He hired others to assist him with his investments, in offices rented for that purpose, and claimed that the salaries and expenses incident to looking after his properties were deductible under section 23(a) of the Revenue Act of 1932, the predecessor of section 162(a). The Supreme Court held that the taxpayer's expenses attributable to investment in securities were not deductible notwithstanding that the taxpayer was engaged in another trade or business, i.e., real estate. The taxpayer therein argued that—

his activities in managing his estate, both realty and personalty, were a unified business. Since it was admittedly a business in so far as the realty is concerned, he urges, there is no statutory authority to sever expenses allocable to the securities. * * * [312 U.S. at 218.]

The Court rejected this argument stating "we see no reason why expenses not attributable, as we have just held these are not, to carrying on business cannot be apportioned." 312 U.S. at 218.

As we have stated, petitioner herein was clearly in the trade or business of trading commodities futures. Petitioner acquired the gold in issue pursuant to delivery on long gold futures contracts which he acquired in the regular course of his business. Petitioner also disposed of the gold pursuant to short gold futures contracts. While petitioner had not regularly held physical commodities for extended periods of time, petitioner did periodically, in the course of his business, take delivery of physical commodities. Further, petitioner took no affirmative action to set apart or distinguish this transaction from other transactions which were entered into in the normal course of his business. These factors strongly suggest that petitioner's gold trans-

action was part of his trade or business of trading commodity futures.

This case is not factually similar to *Higgins* in that the transaction here in issue was integrally related to transactions which were indisputably part of petitioner's trade or business, i.e., the closing of the futures contracts by which the gold was acquired and disposed. In *Higgins*, the only relationship between the taxpayer's investment activities and real estate activities was that they were directed through the same office. *Higgins* does not lead us to the conclusion that the transaction here in issue should be separated out from petitioner's trade or business.

We are not aware of any case which has held that a taxpayer may hold property both as a trader of commodity futures and as an investor in commodities. Past cases have held that a taxpayer may be both a trader and a dealer with respect to securities, but these cases have not dealt with the issue of whether the taxpayer therein was a trader or investor. *Kemon v. Commissioner, supra* at 1033; *Carl Marks & Co. v. Commissioner*, 12 T.C. 1196 (1949).

In *Reinach v. Commissioner*, 373 F.2d 900 (2d Cir. 1967), affg. a Memorandum Opinion of this Court, a self-employed writer of put and call options sold such options through the services of a broker. In every case of an exercised put option, i.e., when the option holder exercised the option to sell stock to the taxpayer, the taxpayer disposed of the put stock immediately. In every case of an exercised call option, i.e., when the option holder exercised the option to buy stock from the taxpayer, the taxpayer never owned (nor was long) the stock. At the time a call option was exercised the taxpayer would, through the services of his broker, purchase the stock to deliver to the optionee. At issue were seven transactions in which a call option was exercised and the taxpayer's broker covered the call but the taxpayer did not immediately replace the stock that the broker delivered to the optionee. As to these seven transactions, the taxpayer maintained short positions for periods ranging from 1½ years to 3½ years.

There was no dispute in *Reinach* that the taxpayer therein was in the trade or business of writing options, and that the profits and losses resulting from his option writing

business were ordinary in nature. The taxpayer argued that losses resulting from the seven short positions should also be treated as ordinary losses because his intent was not to "buy or sell stock except as required to fulfill options which he wrote." 373 F.2d at 904. The Court of Appeals concluded,

Whatever we might think about stock bought to honor a call or disposed of following a put within a few days after their exercise, we do not consider stock borrowed for one and one-half to three and one-half years thereafter to have been "held by the taxpayer *primarily* for sale to customers * * * ."

\* \* . \* \* \* \* \*

When [the taxpayer] persisted in his decision to go short for such lengthy periods of time rather than covering immediately, it could not [sic] longer be said that the stock he sold short was held primarily for sale to any alleged customer. [The taxpayer] made his choice to keep the transaction open; that implied a parallel choice to transform this transaction from the ordinary exercise of an option into a short sale extending over a period of many months or even years.

[373 F.2d at 904; emphasis in original; fn. ref. omitted.]

The Court in *Reinach* did not consider whether the taxpayer therein was a trader or investor with respect to the seven short sales in issue.[12] Further, the opinion in *Reinach* does not furnish us with a basis for determining when a given commodities transaction can be separated out from the trade or business of a commodity futures trader. Even if we were to assume that the gold transaction here in issue could be examined on the same basis as the transaction in *Reinach*, we do not believe that it would lead to the conclusion advocated by respondent. The seven short positions there in issue were held for periods from 1½ to 3½ years. The very fact that the taxpayer therein entered into seven such transactions suggests that he intended to depart from his normal business practices, and the Court therein found that he "went short for a purpose entirely divorced from his put and call writing." 373 F.2d at 904. The gold here in issue was held for less than 1½ years and was not part of a series of transactions suggesting an intent on the

---

[12]The Court in *Reinach* did draw an analogy between the investment intent of the taxpayer therein and an ordinary trader, but to the extent this might be read as stating that the taxpayer was a trader with respect to the short sales, it is dicta. *Reinach v. Commissioner*, 373 F.2d 900, 904 (2d Cir. 1967).

part of petitioner to depart from his regular business practices.

Based on the above, we find that the gold here in issue was not property held for investment within the meaning of section 163(d) and that the investment interest limitations do not apply to petitioner's 1979 and 1980 interest payments made with respect to the holding of such property.

*Decision will be entered under Rule 155.*