DOUGLAS J. MICHELSON, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Michelson v. Commissioner
Docket Nos. 8130-82; 18686-84; 16775-85
United States Tax Court
T.C. Memo 1990-27; 1990 Tax Ct. Memo LEXIS 27; 58 T.C.M. (CCH) 1219; T.C.M. (RIA) 90027; January 16, 1990
Douglas J. Michelson, pro se. Linda L. Wong, and Val J. Albright, for the respondent. PARKER
MEMORANDUM FINDINGS OF FACT AND OPINION PARKER, Judge: In these consolidated cases, respondent determined deficiencies in petitioner's Federal income tax as follows: Year
Amount of Deficiency
1976
$ 77,996
1977
14,121
1978
12,049
1979
93,631
1980
305,653
1981
35,360
Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954, as amended and in effect for the taxable years in question, and all Rule reference are to the Tax Court Rules of Practice and Procedure. This case arises in the context of the attempt by the Hunt family and the Conti group to corner the silver market in late 1979 and early 1980. The principal issue for *29 decision is whether losses sustained by petitioner (primarily in silver futures transactions on various commodity exchanges) are capital or ordinary. The transactions resulting in the losses occurred in 1979 and 1980, and petitioner claims net operating loss carrybacks and carryovers to the other years involved in this case. Alternatively, as to the January 10, 1980, transactions in which Merrill, Lynch, Pierce, Fenner and Smith, Inc. (hereinafter "Merrill Lynch") liquidated petitioner's positions in his commodity account, the issue is whether that liquidation resulted in losses sustained at that time and deductible in 1980. If there was a reasonable prospect of recovery in subsequent years because of petitioner's pending litigation against Merrill Lynch in regard to that liquidation, then it cannot be said that the loss was "sustained" in 1980. Sec. 1.165-1(d)(2)(i), Income Tax Regs. Apart from various expense deductions that respondent conceded at trial, [1] there remain issues as to the amounts and year of deductibility of certain interest paid on petitioner's Merrill Lynch and E. F. Hutton margin accounts. *30 FINDINGS OF FACT At the time he filed his petition in this case, petitioner Douglas J. Michelson (hereinafter "petitioner") resided in Albuquerque, New Mexico. Petitioner filed his individual Federal income tax returns (Forms 1040) for the years 1976 through 1981 with the Internal Revenue Service Center at Austin, Texas, except for the 1978 return that was filed in Fresno, California. With the returns for 1979 and 1980, petitioner for the first time filed Schedule C's on which he claimed to be a dealer in metals. Petitioner was graduated from the University of New Mexico with a bachelor's degree in finance. He immediately went into the family business, Bell Trading Post, Inc., later known as the Sunbell Corporation (hereinafter Sunbell). Sunbell was a manufacturer of silver, turquoise, and copper jewelry and also leather products and copper giftware. At one time Sunbell had four factories in three different states and a nationwide sales force. In 1964 Sunbell had 100 employees and by 1976-1978, its peak years, had 1,000 employees. Both petitioner and his brother served on the board of directors of, and worked for, the family business. The brother was in charge of manufacturing *31 and petitioner was in charge of the data processing department. At one time petitioner also ran Sunbell's subsidiary corporation, Decor Industries, located in Dallas, Texas. Decor Industries dealt in aluminum castings. After petitioner returned from Texas to Sunbell's headquarters in Albuquerque, New Mexico, he was involved in setting up the company's inventory method (LIFO method). In the early 1970's, petitioner sold his interest in the family business and was not thereafter involved in Sunbell's business operations. Petitioner entered politics and in 1972 was elected to a four-year term in the state legislature. He ran for re-election in 1976 but was unsuccessful. Petitioner's income-producing activities thereafter were those of an investor. In 1974, while he was still serving as a state legislator, petitioner opened a commodity account with the local Albuquerque office of Merrill Lynch, a stock and commodity brokerage firm. While the record is not entirely clear, apparently the account was opened as a trade or hedging, rather than as a speculative, account. A significant difference between the two is that the margin requirements on a trade or hedging account are about *32 half as much as those on a speculative account. By 1976 petitioner also had some type of account with E. F. Hutton, another stock and commodity brokerage firm. Petitioner obtained loans pursuant to a line of credit with the First National Bank of Albuquerque, and he used the proceeds of those loans, together with other funds from his stock and cash management accounts, to meet the initial margin requirements and margin calls by Merrill Lynch on his commodity account. In February of 1978 petitioner, as the debtor, executed a Security Agreement, Assignment of Hedging Account, to the First National Bank of Albuquerque, as the secured party. The bank also took petitioner's commodity warehouse receipts as additional collateral for the loans. There is an ongoing dispute between petitioner and Merrill Lynch as to whether petitioner's commodity account was a trade or hedging account, as petitioner contends, or a speculative account, as Merrill Lynch contends. By 1979 and 1980 Merrill Lynch was taking the position that petitioner's commodity account was a speculative account. [2]
*33 On his Federal income tax returns for 1976 through 1978, petitioner listed his occupation as "Investments" and reported substantial amounts of income from interest, dividends, and capital gains as follows: Capital Gains
Year
Interest Income
Dividend Income
Income
1976
$ 48,480
$ 50,394
$ 151,307
1977
48,488
38,892
9,134
1978
52,992
45,420
8,142
Petitioner also reported small amounts of rental income or losses in those years; he did not report any wage income or any Schedule C income or losses from a trade or business. On his Schedule A's for those years, petitioner deducted substantial amounts of interest expense paid to Merrill Lynch, E. F. Hutton, and the First National Bank in Albuquerque (and other banks) and also deducted substantial amounts of investment expenses as miscellaneous itemized expenses. The investment expenses were described as relating to something called "Rembrandt Investments" in which petitioner was described as an "investor." The investment expenses were deducted as miscellaneous itemized expenses on Schedule A and included, among other things, "commodity expenses" or "commodity storage fees" in the amounts of *34 $ 9,915, $ 8,463, and $ 15,213 for 1976, 1977, and 1978, respectively. Beginning with his opening of the commodity account with Merrill Lynch in 1974, petitioner over the years purchased some copper and gold [3] which he held by means of negotiable warehouse receipts. Metal in proper form to be delivered through the commodity exchanges is normally stored in public warehouses approved by the exchanges and is transferred by means of negotiable warehouse receipts so as to obviate the need for the seller to have the metal assayed at the time of delivery. The record does not establish that petitioner ever bought any copper, silver, gold or any other metal from a refinery or any other supplier, or in other words, except in a transaction on a commodity exchange. Petitioner is not a broker, and he must conduct any transactions on the Chicago Board of Trade (CBOT), the New York Commodity Exchange (COMEX), or any other commodity exchange through a licensed broker such as Merrill Lynch or E. H. Hutton. *35 A commodity futures contract is a promise by the person in the "short" position to deliver (sell) and by the person in the "long" position to take delivery of (buy) a fixed quantity of a commodity of a certain grade at a fixed price during a specified delivery month and year. [4] While the year and delivery month are fixed, the person who is to deliver or sell the commodity (the person in the "short" position) has the option as to the day of the specified month on which he will make delivery. The parties to any commodity futures contract always have the right to offset rather than make or take delivery. Most commodity futures contracts are closed out by offset rather than by actual delivery of the commodity, but of course actual delivery does sometimes occur. Petitioner, for example, actually took delivery of some copper and gold. By January 1, 1979, petitioner had acquired through transactions on the commodity exchanges 1,510,225 pounds of copper. Some of the copper had been acquired in 1974 (7 contracts), some in 1975 (21 contracts), and the rest in 1977 (30 contracts), for a total of 58 contracts. Normally, a contract for copper is 25,000 pounds, but there may be some minor variations. *36 Also petitioner had acquired 400 ounces of gold in September of 1975. A contract for gold is 100 troy ounces of a certain fineness. As of January 1, 1979, petitioner owned and held by means of negotiable warehouse receipts 1,510,225 pounds of copper and 400 ounces of gold. During the years 1979 and 1980 petitioner never owned any silver. [5] The record does not establish that he ever owned any silver metal in deliverable form at any time from 1974 through the end of 1980. In early 1979 petitioner went to California to look for a job or some business opportunity. He returned to *37 Albuquerque, New Mexico, after three or four months. Both before and after his trip to California, petitioner entered into various commodity futures contracts in copper, gold, and silver, which resulted in the losses involved in this case. See n.4, supra. Most of the losses were incurred in silver transactions. A silver contract is for 5,000 troy ounces of silver of a specified fineness. In 1978, petitioner had entered into five commodity futures contracts to deliver silver (to sell silver, i.e., "short" positions) as follows: Contract Price
(Proceeds to be
Received for
Delivery of 5,000
Date of
Delivery Month
Price Per
Troy Ounces of
Exchange
Contract
& Year
Troy Ounce *
Silver)
CBOT
11-16-78
Dec. 1980 $ 6.9200 $ 34,600 CBOT
11-17-78
Dec. 1980 6.9900 34,950 CBOT
11-17-78
Dec. 1980 6.9900 34,950 CBOT
11-30-78
Apr. 1979 6.1300 30,650 COMEX
11-30-78
May 1979 6.1500 30,750 *38 In 1979, petitioner entered into 10 more commodity futures contracts to deliver silver as follows: Contract Price
(Proceeds to be
Received for
Delivery of 5,000
Date of
Delivery Month
Price Per
Troy Ounces of
Exchange
Contract
& Year
Troy Ounce
Silver
CBOT
01-22-79
Feb. 1981
$ 7.4300 $ 37,150 CBOT
01-25-79
Apr. 1981
7.6800 38,400 CBOT
02-07-79
Aug. 1981 8.6480 43,240 CBOT
05-01-79
Dec. 1981
9.7000 48,500 CBOT
08-08-79
Jun. 1982
11.1500 55,750 CBOT
08-31-79
Dec. 1979
10.4950 52,475 CBOT
11-27-79
Aug. 1982
21.6000 108,000 CBOT
12-10-79
Apr. 1982
23.4500 117,250 CBOT
12-31-79
Jun. 1981
32.3720 161,860 CBOT
12-31-79
Jun. 1981
31.1720 155,860 In early 1980, petitioner entered into two additional commodity futures contracts to deliver silver as follows: Contract Price
(Proceeds to be
Received for
Delivery of 5,000
Date of
Delivery Month
Price Per
Troy Ounces of
Exchange
Contract
& Year
Troy Ounce
Silver
CBOT
01-02-80
Aug. 1981
$ 33.9740 $ 169,870 CBOT
01-03-80
Apr. 1981
34.0940 170,470 *39 In 1979 and 1980, according to petitioner's expert, Dr. Teweles, silver, and to a lesser extent gold, witnessed "one of the most spectacular bull markets in history." For a number of years before that time silver had hovered around $ 4.00 to $ 6.00 a troy ounce. The price began rising in early 1979, and from about mid-1979 through January of 1980, the price rose spectacularly from about $ 10 to $ 50 an ounce. As was later learned in investigations by the Congress and by various Federal agencies, the silver market was manipulated by the Hunt family and the Conti group in an effort to corner the silver market. [6] Between January 1979 and January 1980, the price of silver rose 675 percent, from $ 6.50 to $ 50.35 per troy ounce. On January 21, 1980, prices began to decline and continued to decline steadily until late March of 1980. On Thursday, March 27, 1980, (referred to as "Silver Thursday") silver dropped to $ 10.80 an ounce. The precipitous decline was even more dramatic than the run-up in price. The efforts of the Hunt family and the Conti group to corner the silver market collapsed when they ran short of money and, as Dr. Teweles described the situation, "couldn't keep the play *40 going." The result was, in Dr. Teweles' words, the "most devastating collapse of any futures market in history." While the market price *41 of silver was rising dramatically and petitioner had no physical silver (no "cash silver" as it is called), he also had no long positions in silver futures contracts to take delivery of or buy any silver. Petitioner instead continued to enter into short positions and to meet increasing margin calls on his short positions despite the advice of a representative of Merrill Lynch that he should be in long positions or at least in some long positions. The Merrill Lynch representative also advised petitioner not to meet margin calls, because, in the representative's opinion, meeting a margin call was merely throwing good money after bad when the market was telling you that you were in the wrong position. Merrill Lynch representatives became more insistent in their advice and finally they told petitioner that the course of action he was pursuing amounted to "financial suicide." For some unfathomable reason, petitioner took Merrill Lynch's advice as some type of personal threat directed against himself. All of the 17 silver futures contracts (listed above by the date on which petitioner entered into the contract) were closed out, with losses on each transaction as follows: Contract Price
(Proceeds to be
Date
received for
Price Per
of
Price Per
delivering 5,000
Date Closed
Troy Oz. to
Contract
Troy Oz.
oz.)
Out (by offset)
Close Out
11-16-78
$ 6.9200
$ 34,600
12-28-79
$ 29.7220
11-17-78
6.9900
34,950
12-31-79
30.8420
11-17-78
6.9900
34,950
01-10-80
36.8000
11-30-78
6.1300
30,650
04-16-79
7.2900
11-30-78
6.1500
30,750
05-25-79
8.8350
01-22-79
7.4300
37,150
01-10-80
37.2500
01-25-79
7.6800
38,400
01-02-80
32.9940
02-07-79
8.6480
43,240
01-03-80
35.1740
05-01-79
9.7000
48,500
01-10-80
39.5000
08-08-79
11.1500
55,750
01-10-80
40.7690
08-31-79
10.4950
52,475
12-04-79
19.5500
11-27-79
21.6000
108,000
01-10-80
41.1650
12-10-79
23.4500
117,250
01-10-80
40.3720
12-31-79
32.3720
161,860
01-10-80
38.2000
12-31-79
31.1720
155,860
01-10-80
38.2000
01-02-80
33.9740
169,870
01-10-80
38.6500
01-03-80
34.0940
170,470
01-10-80
37.7500
*42 Amount to
Date
Close Out
Loss
of
Position (Price x
on
Contract
5,000 Oz.)
Transaction *
11-16-78
$148,610
($ 114,010)
11-17-78
154,210
(  119,260)
11-17-78
184,000
(  149,050)
11-30-78
36,450
(    5,800)
11-30-78
44,175
(   13,425)
01-22-79
186,250
(  149,100)
01-25-79
164,970
(  126,570)
02-07-79
175,870
(  132,630)
05-01-79
197,500
(  149,000)
08-08-79
203,845
(  148,095)
08-31-79
97,750
(   45,275)
11-27-79
205,825 ** (   97,825)
12-10-79
201,860
(   84,610)
12-31-79
191,000
(   29,140)
12-31-79
191,000
(   35,140)
01-02-80
193,250
(   23,380)
01-03-80
188,750
(   18,280)
In *43 each of the 17 silver transactions summarized above, petitioner was in the short position (a contract to deliver silver) and, not having any silver to deliver, had to close out the position by offset and always at a price higher than the contract price. The prices at which petitioner agreed to deliver silver under the contracts varied from a low of $ 6.13 for a contract entered into in November 1978 to a high of $ 34.094 for a contract entered into on January 3, 1980. The prices at which the contracts were closed out varied from a low of $ 7.29 per troy ounce in April of 1979 to a high of $ 41.165 on January 10, 1980. Petitioner describes the closing of transactions by offset as "switches" and suggests that his "switches" merely extended his delivery dates. However, his "switches" resulted in part of the losses he claims in this case. Also, the rising market price of silver resulted in increased margin calls, each $ 1.00 increase in the price of silver making each silver contract (5,000 troy ounces) cost an additional $ 5,000. Petitioner's expert testified that in a rising market the place to be is in the long position, not the short position. Dr. Teweles further testified *44 that when prices rise the person in the short position gets increasing margin calls but for the person in the long position "the increase in price, of course, would be delightful." Except perhaps in the sense of offsetting his positions in lieu of delivery, the record does not establish that petitioner ever entered into a long position in any of his silver futures contracts. Of all of the transactions involved in the net losses claimed in this case, in only two transactions (five contracts for December 1980 copper and seven contracts for February 1980 gold) was petitioner in the long position. The five contracts for December 1980 copper, entered into on February 9, 1979, were closed out by offset on October 4, 1979 at a profit of $ 21,625. The seven contracts for February 1980 gold, entered into on January 7, 1980, were closed one day later and resulted in a loss of $ 9,735.50. Petitioner's explanation of this one-day foray was that he was somehow "testing the liquidity of the market" in gold. Petitioner continued to meet all margin calls on his silver contracts, which were quite substantial. Finally, on January 10, 1980, the New York office of Merrill Lynch, acting in what *45 it regarded as its fiduciary duty and obligation to protect its customer (i.e., to protect petitioner from himself), liquidated and closed all of petitioner's positions in his commodity account. The record is not entirely clear as to whether petitioner had failed to meet Merrill Lynch's last margin call. The period for meeting a margin call for a commodity account is briefer than for a stock account. The record does not show when petitioner received that last margin call or the deadline to meet it. Petitioner denied that he failed to meet that margin call and insisted that on January 11, 1980, he went to the local office of Merrill Lynch in Albuquerque with the money to meet the call, only to learn that his positions had been liquidated the preceding day. Thereafter Merrill Lynch brought suit against petitioner for the deficit balance in his commodity account, and petitioner counterclaimed against Merrill Lynch for, among other things, the alleged improper liquidation of his commodity positions. That litigation was still pending at the time of the trial of this case. [7] Of the $ 1,303,976.50 losses claimed by petitioner for 1980, $ 1,034,930 of that amount resulted when Merrill *46 Lynch liquidated the remaining positions in petitioner's commodity account on January 10, 1980. *47 The 17 silver futures transactions detailed above plus a few futures transactions in copper and gold resulted in the claimed losses of $ 304,895 for 1979 and $ 1,303,976.50 for 1980. [8]
*48 After the losses in the commodity futures transactions were sustained in 1979 and 1980, petitioner for the first time filed Schedule C's with his tax returns. On those Schedule C's, petitioner claimed to be a dealer in metals and claimed the losses as ordinary losses rather than capital losses. [9]
*49 On audit respondent disallowed $ 31,170 of the total interest expense of $ 72,000 claimed by petitioner in 1978 on his Schedule A. The claimed interest expense involved $ 17,249 to Merrill Lynch and $ 13,921 to E. F. Hutton. Respondent conceded at the beginning of the trial that $ 31,016.80 of that amount is properly deductible as a Schedule A interest expense item, as follows: Merrill Lynch
$ 17,248.71
E. F. Hutton 13,768.09
There is no evidence in the record in regard to the balance of the interest disallowed. The E. F. Hutton statement for the month of December 1978 merely shows the amount charged and is not proof that petitioner in fact paid that amount in 1978. In support of his deduction of interest paid to Merrill Lynch on his margin account in 1979, petitioner submitted one page of a Merrill Lynch Statement on Account 433-13024 (not the commodity account) for the month of December 1979. That statement shows a margin interest charge for the month of December of $ 4,370 (actually $ 4,369.59) and a year-to-date amount of $ 29,576. Petitioner argues that this statement shows the "charge was a reduction in the balance" and hence constituted payment. *50 However, both the opening and closing figures on that account were negative, and the Court cannot find that that amount of interest was actually paid in 1979 by petitioner, a cash basis taxpayer. Similarly, the E. F. Hutton statement for December 1979 shows a charge of $ 20,864.67 for margin interest, but there is no evidence that petitioner actually paid that amount in 1979. Respondent determined that petitioner had paid margin interest of $ 26,920 to Merrill Lynch and $ 15,908 to E. F. Hutton. Petitioner has not proved that he paid any amounts of margin interest in 1979 in excess of the amounts allowed by respondent. For 1980 respondent increased petitioner's interest expense deduction, but treated all of it as a Schedule A itemized deduction. As to various expenses itemized on petitioner's Schedule C for 1981 that respondent disallowed on audit, respondent at the beginning of the trial conceded that certain items had been substantiated but respondent takes the position that these items are only deductible on Schedule A as deductions under section 212. There is no evidence in the record to support either the amount or the deductibility of any remaining Schedule C items disallowed. *51 ULTIMATE FINDINGS OF FACT 1. Petitioner was not engaged in a trade or business as a dealer in metals in 1979 and 1980. 2. The losses petitioner sustained in 1979 and 1980 in certain commodity futures transactions were not hedging losses. 3. In his commodity futures transactions in 1979 and 1980, petitioner was acting as an investor or as a speculator trading on his own account and the losses he sustained were capital losses. 4. As to the portion of the 1980 loss attributable to Merrill Lynch's liquidation of his commodity account, petitioner has not established that that portion of the loss was "sustained" in 1980. 5. Petitioner has not established that he paid interest on his margin accounts with Merrill Lynch and E. F. Hutton in excess of the amounts allowed by respondent. OPINION The primary issue in this case is the proper characterization of the net losses on commodity futures, principally silver futures, as ordinary or capital. This depends on whether the commodity futures were "capital assets" within the meaning of section 1221. The term "capital asset" is defined *52 in section 1221 as "property held by the taxpayer (whether or not connected with his trade or business)," with certain specific exceptions. The only exception on which petitioner can rely is section 1221(1), which excludes from the term "capital asset" stock in trade of the taxpayer or other property of a kind which would properly be included in the inventory of the taxpayer if on hand at the close of the taxable year, or property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business. Petitioner contends he was a dealer in metals and that the commodity futures contracts were hedging transactions integral to his trade or business as a metals dealer. Respondent contends petitioner was a speculator trading on his own account or an investor, either of whom hold the commodity futures as capital assets. In various contexts the terms "dealer," "trader, " and "investor" become significant for Federal tax purposes. In different contexts where the tax issue turns on whether or not the person is engaged in a trade or business, a distinction is drawn between a trader (one dealing on his own account in securities or commodity futures) who is *53 considered to be engaged in a trade or business and an investor who is not. Higgins v. Commissioner, 312 U.S. 212 (1941) (business expense deduction under predecessor of section 162); Moller v. Commissioner, 721 F.2d 810 (Fed. Cir. 1983) (office-in-the-home expense under section 280A); King v. Commissioner, 89 T.C. 445 (1987) (investment interest limitation under section 163(d)). [10] See also Groetzinger v. Commissioner, 82 T.C. 793, 800-801 (1984), affd. 771 F.2d 269 (7th Cir. 1985), affd. 480 U.S. 23 (1987). However, the characterization of property as a "capital asset" vel non does not turn on whether the taxpayer is engaged in a trade or business, whether he has a business motive for acquiring or holding the property, or whether the property is "connected with his trade or business." Sec. 1221; Arkansas Best Corp. v. Commissioner, 485 U.S. 212 (1988). Thus, the distinction between a trader and an investor has no bearing on the determination of whether securities or commodity *54 futures are capital assets in the hands of the particular taxpayer since such securities or commodity futures would be capital assets in the hands of either a trader or an investor. King v. Commissioner, 89 T.C. at 458 and n.5. In transactions involving securities or commodity futures, a distinction is also drawn between a trader and a dealer. Whether a particular taxpayer is a dealer or a trader is a question of fact. Kemon v. Commissioner, 16 T.C. 1026 (1951). In Kemon, 16 T.C. at 1032-1033, we explained the distinction between a dealer and a trader as follows: In determining whether a seller of securities sells to "customers," the merchant analogy has been employed. * * * Those who sell "to customers" are comparable to a merchant in that they purchase their stock in trade, in this case securities, with the expectation of reselling at a profit, not because of a rise in value during the interval *55 of time between purchase and resale, but merely because they have or hope to find a market of buyers who will purchase from them at a price in excess of their cost. This excess or mark-up represents remuneration for their labors as a middle man bringing together buyer and seller, and performing the usual services of retailer or wholesaler of goods. * * * Such sellers are known as "dealers." Contrasted to "dealers" are those sellers of securities who perform no such merchandising functions and whose status as to the source of supply is not significantly different from that of those to whom they sell. That is, the securities are as easily accessible to one as the other and the seller performs no services that need be compensated for by a mark-up of the price of the securities he sells. The sellers depend upon such circumstances as a rise in value or an advantageous purchase to enable them to sell at a price in excess of cost. Such sellers are known as "traders." [Citations omitted.] See also Adnee v. Commissioner, 41 T.C. 40 (1963). [11]
*56 Petitioner tries to bring himself within this "merchant analogy." Petitioner does not, however, claim to be either a dealer or a trader in commodity futures. In fact, he denies any dealing in commodity futures, insisting that he deals not with commodity futures but with the physical metals themselves. See n.4, supra. Petitioner says he is a dealer in metals, that he earns his living buying metals for his "inventory" and selling metals from his "inventory." He insists the commodity futures were merely hedging transactions in connection with his metals business, apparently invoking the presumed judicial exception of Corn Products Refining Co. v. Commissioner, 350 U.S. 46 (1955) to section 1221. However, see and compare Arkansas Best Corp. v. Commissioner, supra.Unfortunately for petitioner, the record in this case simply does not establish that he had any trade or business separate and apart from his transactions on the commodity exchanges. The Court reaches that conclusion despite the fact that petitioner over the years had acquired some copper and gold that he held by means of negotiable warehouse receipts. He had held that metal *57 for rather long periods of time, two years or more, having acquired it in the period from 1974 through 1977. Thus, the metal itself has the characteristics of an asset held for investment purposes, a capital asset, and not an "inventory" item. Moreover, that metal too was acquired through transactions on commodity exchanges. There is no evidence in the record that petitioner ever acquired any metal directly from a refinery or any other off-exchange supplier. Also, while petitioner did own this copper and gold, he never owned any silver, and most of the losses in this case involved silver futures. See n.5, supra. Finally, the record reflects no frequent sales of metals by petitioners to customers, or related merchandising activity, such as advertising and sales calls, of sufficient frequency and scope to rise to the level of a "trade or business." Groetzinger v. Commissioner, supra.
Petitioner's expert, Dr. Teweles, testified that petitioner's commodity account with Merrill Lynch was a hedging account. However, it is evident from his testimony that Dr. Teweles believed that petitioner was engaged in some business separate and apart from the commodity *58 futures transactions themselves. Dr. Teweles' contacts with petitioner in advance of the trial were quite minimal. The Court is satisfied that Dr. Teweles did not have the slightest inkling that petitioner's alleged metals business was nothing more than these commodity futures transactions themselves. Also, even as to his characterization of the commodity account as a hedging account, Dr. Teweles relied almost entirely upon his belief that Merrill Lynch had determined that the account was a hedging account. Dr. Teweles agreed that if Merrill Lynch had not determined it to be a hedging account, his conclusion would be different. Merrill Lynch regarded the account as a speculative account, at least by 1979 and 1980. See n.2, supra. While Dr. Teweles is a well qualified professor of finance and knowledgeable in the commodities field, his conclusions were based upon misconceptions of the underlying facts of this case. Accordingly, the Court disregards Dr. Teweles' conclusions as unsupported by the facts of record. It is clear to the Court that petitioner is trying to concoct a trade or business out of his commodity futures transactions. Petitioner says he is in the physical *59 metals business (which the record does not support), that these commodity transactions involved the same kind of physical metals in which he allegedly dealt (which is contrary to the record, particularly in regard to silver) and that that makes his losses ordinary rather than capital losses. So far as the record shows, the transactions in commodity futures in 1979 and 1980 did not differ from petitioner's earlier commodity futures transactions from 1974 through 1978 when he was admittedly an investor, reporting income from interest, dividends, and capital gains. It was only after he sustained the huge losses during the Hunt family silver debacle that petitioner for the first time filed Schedule C's and claimed to be a dealer in metals. As the facts of this case establish, petitioner was an investor or a speculator trading on his own account in commodity futures. He performed no merchandising functions. He had no customers who regularly purchased either commodity futures or metals in the ordinary course of business. As we noted in Kemon v. Commissioner, 16 T.C. at 1033, petitioner's "source of supply" (the commodity exchanges) was not significantly different *60 from that of those to whom he sold (those on the opposite side of his commodity futures contracts). All of petitioner's commodity transactions were handled through Merrill Lynch. He was not licensed to sell commodity futures nor was he a member of any commodity exchange. See Mirro-Dynamics Corp. v. United States, 374 F.2d (9th Cir. 1967), cert. denied 389 U.S. 896 (1967). Nor was petitioner engaged in any separate business which utilized copper, gold, or silver. Thus, the commodity futures transactions were neither a hedge against raw materials used in a business nor purchases to insure a steady supply of raw material. Corn Products Refining Co. v. Commissioner, supra; Sicanoff Vegetable Oil Corp. v. Commissioner, 27 T.C. 1056 (1957), revd. on other grounds 251 F.2d 764 (7th Cir. 1958). Petitioner's short positions in silver could not guarantee him a minimum sales price since he had no silver to sell; his short positions could not provide him with any supply of or promise of supply of any silver such as long positions might have. Thus, petitioner's reliance on the example of a corn farmer engaging in futures *61 transactions is completely inapt. The corn farmer with a corn crop growing in the field enters into a futures contract to deliver or sell corn at a certain price ("short" position) to guarantee a minimum price at which he can later sell his crop; the corn farmer may also enter into futures contracts to receive delivery of or buy corn at a certain price ("long" position) to guarantee a supply of corn at a certain price if his corn crop should fail or fall short of his expectations. Petitioner cannot come within this traditional type of hedging transaction, as he argues. Nor can petitioner bring himself within the judicial exception of the Corn Products doctrine, which at a bare minimum requires that the taxpayer have some separate trade or business apart from the commodity futures transactions themselves. [12]
*62 Nevertheless, Dr. Teweles attempted to label petitioner's commodity futures transactions as an "anticipatory hedge," even if he did not own any silver at the time. Again Dr. Teweles was assuming, contrary to the facts, that petitioner was engaged in a metals business separate and apart from the commodity futures transactions themselves. Since petitioner did not have any other business and since he did not have and had never had any silver in his so-called "inventory," the logic of the situation is that petitioner was gambling that silver prices would fall and that he could obtain the silver at prices less than the prices in his short positions. There is an indication in the record that petitioner believed the Federal Government would step in and force down the price of silver. That did not happen. With the price of silver continuing to escalate dramatically during the Hunt family's foray into the silver market, petitioner, against the advice of his broker, continued to enter only short positions to deliver silver he did not have and silver which he could obtain (actually or by offset) only at ever increasing prices. The Court agrees with Merrill Lynch's warning to petitioner *63 that this was tantamount to "financial suicide." Petitioner's transactions simply do not come within the merchant category, either actually or by analogy. As the Supreme Court's opinion in Arkansas Best Corp. v. Commissioner, supra, teaches us, section 1221 defines "capital asset" broadly, the statutory exceptions are the exclusive exceptions to that definition, the motive with which the taxpayer acquires or holds the property is irrelevant (i.e., that the taxpayer acquires or holds the property for a business purpose is irrelevant), and whether the property is "connected with his trade or business" is irrelevant. What is determinative, the Supreme Court teaches us, is whether the taxpayer can bring himself within one of the specific statutory exceptions to the definition of "capital asset." The Corn Products case itself involved the application of section 1221's inventory exception, with the Supreme Court stating therein (350 U.S. at 50) that the company's futures transactions were "an integral part of its business designed to protect its manufacturing *64 operations against a price increase in its principal raw material and to assure a ready supply for future manufacturing requirements." As our findings of fact and the discussion above amply demonstrate, petitioner had no metals business apart from the commodity futures transactions themselves. Petitioner was speculating on his own account. What we said in Kemon v. Commissioner, supra, 16 T.C. at 1032, in regard to securities is equally applicable to commodity futures, namely, Whether or not securities are held primarily for sale to customers in the ordinary course of business is a question of fact, Stern Brothers & Co., 16 T.C. 295, in which the crucial phrase is "to customers." This phrase and the word "ordinary" were added to the definition of capital assets by Senate Amendment No. 66 in the Revenue Act of 1934 so that a speculator trading on his own account could not claim the securities he sold were other than capital assets. The theory of the amendment was that those who sell securities on an exchange have no "customers" and for that reason the *65 property held by such taxpayers is not within the above quoted exclusionary clause. O. L. Burnett, 40 B.T.A. 605, 118 F.2d 659; Thomas E. Wood, 16 T.C. 213. Those who merely buy or sell on a commodity exchange, as petitioner did, have no "customers" and are not engaged in a trade or business as a merchant, either actually or by analogy. The Court concludes that petitioner was either an investor or a speculator trading on his own account as to these commodity futures. In either capacity, the commodity futures contracts were capital assets in his hands and his losses therefrom were capital losses. In the notice of deficiency for 1980, respondent alternatively determined that petitioner had not established that transactions which occurred on or about January 10, 1980 as a result of the liquidation of your brokerage account were closed transactions or that there was no reasonable prospect of recovery with respect to the losses [$ 1,034,930] claimed * * *. The issue having been raised in the notice of deficiency, petitioner bears the burden *66 of proof. Welch v. Helvering, 290 U.S. 111, 115 (1933); Rule 142(a). Petitioner has failed to sustain that burden. The record contains little information about the litigation between Merrill Lynch and petitioner. See n.7, supra. However, in that litigation petitioner counterclaimed against Merrill Lynch, contending the liquidation of his commodity account was improper. That litigation was still pending at the time of the trial of this case. We agree with respondent that petitioner has not established that in 1980 there was no reasonable prospect of recovery with respect to $ 1,034,930 of the loss claimed for that year. Accordingly, we cannot find that that portion of the 1980 loss was "sustained" in that year. Sec. 1.165-1(d)(2)(i), Income Tax Regs.
The final issue is the interest on petitioner's margin accounts with E. F. Hutton and Merrill Lynch. Section 163(a) allows as a deduction "all interest paid or accrued within the taxable year on indebtedness." The narrow issue is the amount of such margin account interest that petitioner, a cash-basis taxpayer, actually paid in each of the years 1978, 1979 and 1980. The E. F. *67 Hutton and Merrill Lynch statements upon which petitioner relied merely show the amount of such interest that was charged by E. F. Hutton or Merrill Lynch each year. Those statements do not prove the amount that petitioner actually paid each year. Petitioner has not established that he actually paid any margin account interest in excess of the amounts allowed by respondent. To reflect respondent's concessions and the above holdings, Decisions will be entered under Rule 155. Footnotes
1. While respondent concedes that various expenses have been substantiated and are deductible, respondent does not agree that these are Schedule C business expenses. Respondent contends that they are instead deductible under section 212. An issue was raised as to the statute of limitations for the taxable year 1981, but the parties' oral stipulation on the record as to the date of mailing of the deficiency notice and PS Form 3877 (stipulated into evidence) show that the notice was timely mailed; petitioner received the notice and timely filed his petition in this Court. That disposes of the statute of limitations issue. Mulvania v. Commissioner, 81 T.C. 65 (1983); Frieling v. Commissioner, 81 T.C. 42↩ (1983). Petitioner's further arguments on this matter are frivolous.
2. This dispute consumed much trial time and seems to loom large in petitioner's view of the case. Petitioner seeks to draw the issue narrowly as to whether his commodity account was a trade or hedging account or a speculative account, apparently assuming that if it can be characterized as a hedging account that automatically guarantees ordinary loss treatment for Federal income tax purposes. Petitioner's expert, Dr. Richard J. Teweles, concluded that petitioner had a hedging account, but based his conclusion on the fact that Merrill Lynch had, he (Dr. Teweles) believed, determined that it was a hedging account. Dr. Teweles relied almost entirely on what he thought was Merrill Lynch's determination. Dr. Teweles candidly admitted that if Merrill Lynch had not determined it to be a hedging account, then his conclusion would be different. A representative of Merrill Lynch testified that the account number was that of a speculative account rather than a hedging account and that petitioner was using the account in 1979 and 1980 to speculate. We need not, however, resolve the dispute. Whether this commodity account in 1979 and 1980 was a hedging account or a speculative account may well have significance for purposes of the Commodity Exchange Act, 7 U.S.C. sec. 1 et seq.↩, and the regulations of the various commodity exchanges and probably for purposes of Merrill Lynch's determination of proper margin calls on petitioner's account, but is not determinative of the tax issues before this Court. If it were necessary to make a finding, we would accept the testimony of the Merrill Lynch representative and find that in 1979 and 1980 petitioner had a speculative account or at least was using his account to speculate.
3. The record is not wholly clear that this copper and gold metal generated the commodity expenses or commodity storage fees that petitioner deducted on his Schedule A's in 1976, 1977, and 1978. However, the 1,510,225 pounds of copper and 400 ounces of gold petitioner held January 1, 1979, are the only actual physical metal that petitioner has established that he ever owned in the period from 1974 through the end of 1980. The record, although quite extensive with over 1,000 pages of transcript, is singularly devoid of any information as to petitioner's alleged transactions in metals, other than the few transactions on the commodity exchanges that resulted in the large losses claimed on his 1979 and 1980 tax returns, which are the subject of this lawsuit.↩
4. While petitioner denies he dealt in commodity futures contracts and insists he dealt only in the actual physical metals themselves, he is either engaged in a semantical quibble over words or his argument is not supported by the facts of record.↩
5. When pressed on this point, petitioner insisted he did own some silver (the physical metal as opposed to commodity futures contracts for silver). However, he then conceded that the silver he owned was silver coins, which were not in proper form for delivery on an exchange and which he regarded as collector's items held for investment purposes.↩
*. The prices are carried out to the fourth decimal place merely because they are shown that way on the Merrill Lynch statements (but without the decimal points which the Court has added for clarity, since otherwise the "69200" might be mistaken for $ 69,200 instead of $ 6.92).↩
6. Petitioner devoted much of the trial time to the details of this attempt to corner the silver market, a matter which apparently is involved in his ongoing litigation against Merrill Lynch and various other brokerage firms and individuals. However, it is not necessary in this case to go into the details of that attempt, a comprehensive statement of which is set forth in H. Rept. No. 97-395 (1981) entitled "Silver Prices and the Adequacy of Federal Actions in the Marketplace, 1979-80, Seventeenth Report of the Committee on Government Operations together with Separate and Dissenting Views." While that 173-page report outlines various problems, there was little unanimity on the matter and most of the complex financial and regulatory issues are still unresolved or in litigation in various courts in numerous lawsuits. There seems to be agreement that the Hunt family and the Conti group got control of large concentrations of physical silver (referred to as "cash silver") and also used the futures market for additional deliveries of cash silver.↩
*. Petitioner on his tax returns computed the losses resulting from the contracts closed in 1979 exclusive of broker's commissions and fees, but computed the losses resulting from the contracts closed in 1980 inclusive of those commissions and fees. For consistency, the Court has listed all of them exclusive of those expense items. ** Petitioner failed to claim this loss on his 1980 tax return, but if petitioner otherwise prevails, respondent agrees that loss should be allowed.↩
7. Petitioner offered into evidence a copy of a Memorandum Opinion and Order of the United States District court for the District of New Mexico, filed August 12, 1982. Petitioner offered that document because of the statement on the first page that "Defendant Michelson is a dealer in precious metals," asking us to take "judicial notice" of that fact. We refused to receive the document for that purpose. As we have pointed out in other cases "The mere fact that a court in one opinion makes findings of fact is not a basis for the same or another court in another proceeding to take judicial notice of those findings and to deem them to be indisputably established for purposes of the pending litigation." Estate of Reis v. Commissioner, 87 T.C. 1016, 1028-1029 (1986). See also Moore v. Commissioner, T.C. Memo. 1989-306. Moreover, respondent is not a party to nor in privity with any party to that Merrill Lynch-Michelson litigation; the matter came up on plaintiff Merrill Lynch's motion for summary judgment and was not an adjudication on the merits. Also, we do not know whether Michelson's status as "a dealer in precious metals" was in issue in that case. In any event, that case would not be determinative of his status for Federal tax purposes. Finally, we may take judicial notice of adjudicative facts not subject to reasonable dispute which are either generally known within the jurisdiction of the Court or capable of accurate and ready determination by resort to sources whose accuracy cannot be reasonably questioned. Petzoldt v. Commissioner, 92 T.C. 661, 674↩ (1989). Petitioner's status as a dealer in metals vel non is not such a fact. That District Court Memorandum Opinion and Order, while not admitted into evidence, remains associated with the files of the present case. That document does not cast much light on the issues that the District Court disposed of by summary judgment nor does it tell us anything about the issues that remain in controversy in that litigation. Other than that document there is no information in our record in regard to the pending Merrill Lynch-Michelson litigation.
8. Petitioner denies that he claimed losses, but that is the bottom-line result. As a matter of mechanics, for 1979 petitioner reported the proceeds on the sale of certain copper (the physical metal or "cash copper") on a Schedule C as gross receipts or sales of $ 460,050. Petitioner then treated the so-called "hedging losses" of $ 304,895 as an adjustment to "inventory," i.e., as the alleged cost of acquiring additional "inventory," and thus effectively deducted the losses as part of costs of goods sold. Similarly, for 1980 petitioner reported proceeds on the sale of some more copper and the 400 ounces of gold as gross receipts or sales of $ 733,335. Petitioner then treated the so-called "hedging losses" of $ 1,303,977 as an adjustment to "inventory," i.e., as the alleged cost of acquiring additional "inventory," and thus effectively deducted the losses as part of costs of goods sold. The copper was sold in transactions on the commodity exchange by actual delivery but the gold was sold in an off-exchange transaction to a bank in Canada. The $ 302,000 proceeds from the gold sale and the $ 431,335 from the copper sales were used to pay off petitioner's loan from the First National Bank of Albuquerque. On November 7, 1979, the bank had made another loan to petitioner, and as a result held petitioner's note for $ 720,000 and also held the certificate for the gold and the warehouse receipts for the copper as additional collateral on that loan.↩
9. These Schedule C's were prepared by petitioner himself and submitted to his accounting firm, Peat, Marwick and Mitchell. The accounting firm simply recopied the Schedule C as prepared by petitioner; the accounting firm did not conduct any audit, review, or verification of any of the figures or of any underlying documentation. Petitioner's attempt to suggest otherwise was refuted by the crystal clear and candid testimony of the Peat, Marwick and Mitchell representative whom the Court found to be wholly credible and worthy of belief. Petitioner's testimony in regard to the preparation of the Schedule C's was deceptive and lacking in candor. The Peat, Marwick and Mitchell representative also testified that the accounting firm did not maintain petitioner's books and records, but merely prepared petitioner's tax returns, another matter on which petitioner was less than candid with the Court.↩
10. See also Asch v. Commissioner, T.C. Memo. 1986-238; Zambakian v. Commissioner, T.C. Memo. 1986-219↩.
11. See also Huebschman v. Commissioner, T.C. Memo. 1980-537; Ferguson v. Commissioner, T.C. Memo. 1974-244↩.
12. We need not and do not address the question of whether the Corn Products doctrine retains any vitality after the Supreme Court's opinion in Arkansas Best Corp. v. Commissioner, 485 U.S. 212 (1988). Suffice it to say here, even before the Supreme Court's Arkansas Best opinion and even assuming the full vitality of the Corn Products↩ doctrine in its most expansive interpretation, petitioner could not prevail.