STEPHEN A. PAOLI AND BETTY MAE PAOLI, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Paoli v. Commissioner
Docket No. 33570-87
United States Tax Court
T.C. Memo 1991-351; 1991 Tax Ct. Memo LEXIS 400; 62 T.C.M. (CCH) 275; T.C.M. (RIA) 91351; July 31, 1991, Filed *400 Decision will be entered under Rule 155. William J. Gerard, for the petitioners. Teri A. Frank, for the respondent. WHALEN, Judge. WHALEN
MEMORANDUM FINDINGS OF FACT AND OPINION Respondent determined the following deficiency in, and additions to, petitioners' 1982 Federal income tax: Additions to tax under sections
Deficiency
6651(a)(1)
6653(a)(1)
6653(a)(2)
6661
$ 34,780
$ 8,695
$ 1,739
50% of interest
$ 8,695
due on $ 34,780
All section references are to the Internal Revenue Code as amended. The issues for decision are: (1) Whether interest paid by petitioners on accounts maintained at various brokerage firms is "investment interest," subject to the limitation contained in section 163(d); (2) whether petitioners are liable for self-employment tax on certain management fees; and (3) whether petitioners are liable for additions to tax under sections 6651(a)(1), 6653(a)(1) and (2), and 6661. FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulation of facts filed by the parties and attached exhibits are incorporated herein. Petitioner Stephen A. Paoli is the founder of Paoli Manufacturing Corporation *401 located in Rockford, Illinois. At the time of trial, he was also the corporation's sole shareholder and president. In this opinion, we sometimes refer to Mr. Paoli as petitioner. Paoli Manufacturing Corporation manufactured certain boning machines which petitioner had invented. During 1982, petitioner managed the corporation and performed services for it as an inventor. The corporation paid $ 100,000 to petitioner as compensation for his services. Petitioners reported this amount on their 1982 Federal income tax return as "Mgmt Fee." No State or Federal taxes were withheld by the company from the payment. In addition to the services which he performed for Paoli Manufacturing Corporation, petitioner engaged in the purchase and sale of stocks and options. In order to facilitate this activity, he maintained private telephone lines with a stock brokerage house, and had frequent conversations with brokers. He had a Quotron machine in his home which could be used to obtain current stock prices. He also collected information about stocks from periodicals, reports on companies, and directly from the issuing companies themselves. Petitioner maintained a number of account with brokerage *402 firms in connection with his activity of purchasing and selling stock. All of petitioner's stock transactions in 1982 were made through brokerage firms. He was not a member of any stock exchange nor was he licensed under any State or Federal laws as a dealer or sales person of stocks or securities. On July 23, 1984, petitioners filed a joint Federal income tax return with respondent for the year 1982. On Schedule C of the return, they claimed an interest deduction of $ 64,300 for payments made to six brokerage firms as follows: Payee
Amount
E.F. Hutton & Co., Inc.
$ 23,677
Dean Witter Reynolds, Inc.
8,205
Ernst & Co.
15,599
Fidelity Securities, Inc.
318
LaSalle Securities, Inc.
5,868
Bache
10,633
Total
$ 64,300
On a schedule attached to their 1982 return entitled "Schedule of Gains and Losses From Sales or Exchanges of Property" (Schedule of Gains and Losses), petitioners reported that they had realized a total of $ 9,827,405.37 from the sale of stocks and options during the year which had cost a total of $ 10,759,383.73, and that they had incurred expenses of sale in the aggregate amount of $ 99,244.03. Accordingly, on Schedule D of their 1982 return, petitioners *403 reported net short-term capital loss of $ 759,444.48 and net long-term capital loss of $ 271,777.91. The Schedule of Gains and Losses consists of 22 pages which show the individual transactions, generally sales of stock and expirations of options, which make up the capital losses reported for the year. The Schedule purports to segregate the transactions made through each of eight brokerage accounts, five of which are labeled with the name of a brokerage firm and three of which are labeled with the name of an account holder. Set out below is a summary of the transactions reflected on the Schedule of Gains and Losses for each of the eight accounts: Account Description
Gross Sales Price
Cost
Expense
Bache
$ 1,438,647.92
$ 1,594,497.40
$ 34,661.06
LaSalle
3,109,433.00
3,295,932.51
16,758.00
Ernst & Co.
3,061,689.50
3,240,281.00
15,814.61
Fidelity
1,374,408.70
1,521,422.82
23,978.48
E.F. Hutton
381,170.00
487,297.50
2,428.45
Stephen and
5,226.00
4,025.00
200.27
Pauline Paoli
and Sauvina Hobbs
Betty M. Paoli
218,630.00
308,495.00
2,102.88
Stephen and Betty Paoli
238,200.25
307,432.50
3,300.28
$ 9,827,405.37
$ 10,759,383.73
$ 99,244.03
Account Description
Short Term
Long Term
Bache
($ 174,532.72)
($ 15,977.82)
LaSalle
(71,186.00)
(132,071.51)
Ernst & Co.
(175,288.61)
(19,117.50)
Fidelity
(170,992.60)
-0-
E.F. Hutton
(46,252.02)
(62,303.93)
Stephen and
199.73
801.00
Pauline Paoli
and Sauvina Hobbs
Betty M. Paoli
(91,967.88)
-0-
Stephen and Betty Paoli
(29,424.38)
(43,108.15)
($ 759,444.48)
($ 271,777.91)
*404 The record does not establish the brokerage firm in which each of the last three accounts, listed above under the name of individual account holders, was held. It appears from the record that Ms. Pauline Paoli and Ms. Sauvina Hobbs are petitioner's mother and sister. The Schedule of Gains and Losses shows the following number of sales made through all of the above accounts during each month of 1982, broken down by the holding period of the stocks sold. TABLE I Holding Period
Month
0 day
1-30 days
31-180 days
181-365 days
366+ days
Unknown
TOTAL
January
59
8
1
2
5
1
76
February
42
16
2
0
4
1
65
March
5
3
16
11
13
0
48
April
1
3
0
15
1
0
20
May
2
26
1
6
7
2
44
June
0
6
4
3
0
0
13
July
0
7
0
0
4
0
11
August
2
13
1
0
1
0
17
September
2
10
0
2
0
0
14
October
0
0
0
0
1
0
1
November
0
0
0
0
0
0
0
December
0
0
0
0
0
0
0
Unknown
0
0
0
0
0
17
17
TOTAL
113
92
25
39
36
21
326
We note, in passing, that the Schedule of Gains and Losses does not set forth the dates on which options expired. Accordingly, the tables and graphs in this opinion treat the month of expiration and the *405 holding period of options as "unknown." This treatment explains each of the 17 items listed above for which both the month of sale and holding period are unknown. If these items were allocated according to the month in which each option expired, the above analysis would not be substantially different. The aggregate amount realized from the above sales during each month of 1982, broken down by the holding period of the stocks sold, is set out in the following table: TABLE II Holding Period
Month
0 day
1-30 days
31-180 days
181-365 days
January
$ 2,718,389.50
$ 207,762.50
$ 11,150.00
$ 8,875.00
February
1,698,862.50
1,163,100.00
13,775.00
0
March
694,012.50
63,875.00
524,832.50
625,413.70
April
1,875.00
63,562.50
0
55,280.23
May
41,412.50
487,054.94
23,437.50
101,144.50
June
0
76,325.00
73,750.00
7,735.00
July
0
197,825.00
0
0
August
33,168.75
127,537.50
77,500.00
0
September
48,850.00
89,412.50
0
955.75
October
0
0
0
0
November
0
0
0
0
December
0
0
0
0
Unknown
0
0
0
0
TOTAL
$ 5,236,570.75
$ 2,476,454.94
$ 724,445.00
$ 799,404.18
Month
366+ days
Unknown
TOTAL
January
$ 24,393.75
$ 15,650.00
$ 2,986,220.75
February
9,187.50
312.50
2,885,237.50
March
321,781.50
0
2,229,915.20
April
29,725.00
0
2,229,915.20
May
69,575.00
2,683.00
725,307.44
June
0
0
157,810.00
July
55,447.25
0
253,272.25
August
9,525.00
0
247,731.25
September
0
0
139,218.25
October
22,375.00
0
22,375.00
November
0
0
0
December
0
0
0
Unknown
0
29,875.00
29,875.00
TOTAL
$ 542,010.00
$ 48,520.50
$ 9,827,405.37
*406 The number of purchases made during each month of 1982 and the aggregate purchase price of the stocks and options bought during each month, as shown on the Schedule of Gains and Losses, is set out below as follows: Number of
Month
Purchases
Price
January
67
$ 2,983,679.83
February
62
3,053,065.80
March
7
797,982.62
April
12
203,044.75
May
31
604,862.19
June
11
234,067.90
July
9
96,721.08
August
23
285,713.19
September
4
78,251.79
October
0
-0-
November
0
-0-
December
0
-0-
Unknown
6
84,956.25
Pre-1982
94
2,436,282.36
Total
326
$ 10,858,627.76
We note that the Schedule of Gains and Losses is *407 intended to provide information about the stocks which were sold and the options which expired during 1982. It does not detail all of the purchases of stocks and options made by petitioner during the year. The record does not provide such information elsewhere. Petitioners resided in Rockford, Illinois, at the time they filed their petition herein. OPINION The principal issue in this case is whether interest in the amount of $ 64,300 which petitioners paid during 1982 to six brokerage firms is "investment interest" within the meaning of section 163(d). Section 163(a) allows a deduction for "all interest paid or accrued within the taxable year on indebtedness." However, in the case of a taxpayer other than a corporation, section 163(d) provides that the amount of "investment interest" which can be deducted in the current taxable year is limited to $ 10,000 plus the amount of the "net investment income." Any investment interest in excess of that limit is treated as investment interest paid or accrued in the succeeding taxable year. Sec. 163(d)(2). As in effect during 1982, section 163 provided as follows: (d) LIMITATION ON INTEREST ON INVESTMENT INDEBTEDNESS. -- (1) IN GENERAL. *408 -- In the case of a taxpayer other than a corporation, the amount of investment interest (as defined in paragraph (3)(D)) otherwise allowable as a deduction under this chapter shall be limited, in the following order, to -- (A) $ 10,000 ($ 5,000, in the case of a separate return by a married individual), plus (B) the amount of the net investment income (as defined in paragraph (3)(A)), plus the amount (if any) by which the deductions allowable under this section (determined without regard to this subsection) and sections 162, 164(a)(1) or (2), or 212 attributable to property of the taxpayer subject to a net lease exceeds the rental income produced by such property for the taxable year. In the case of a trust, the $ 10,000 amount specified in subparagraph (A) shall be zero. (2) CARRYOVER OF DISALLOWED INVESTMENT INTEREST. - The amount of disallowed investment interest for any taxable year shall be treated as investment interest paid or accrued in the succeeding taxable year. (3) DEFINITIONS. -- For purposes of this subsection -- (A) NET INVESTMENT INCOME. -- The term "net investment income" means the excess of investment income over investment expenses. If the taxpayer *409 has investment interest for the taxable year to which this subsection (as in effect before the Tax Reform Act of 1976) applies, the amount of the net investment income taken into account under this subsection shall be the amount of such income (determined without regard to this sentence) multiplied by a fraction the numerator of which is the excess of the investment interest for the taxable year over the investment interest to which such prior provision applies, and the denominator of which is the investment interest for the taxable year. (B) INVESTMENT INCOME. -- The term "investment income" means -- (i) the gross income from interest, dividends, rents, and royalties, (ii) the net short-term capital gain attributable to the disposition of property held for investment, and (iii) any amount treated under sections 1245, 1250, and 1254 as ordinary income, but only to the extent such income, gain, and amounts are not derived from the conduct of a trade or business. (C) INVESTMENT EXPENSES. -- The term "investment expenses" means the deductions allowable under sections 162, 164(a)(1) or (2), 166, 167, 171, 212, or 611 directly connected with the production of investment income. *410 For purposes of this subparagraph, the deduction allowable under section 167 with respect to any property may be treated as the amount which would have been allowable had the taxpayer depreciated the property under the straight line method for each taxable year of its useful life for which the taxpayer has held the property, and the deduction allowable under section 611 with respect to any property may be treated as the amount which would have been allowable had the taxpayer determined the deduction under section 611 without regard to section 613 for each taxable year for which the taxpayer has held the property. (D) INVESTMENT INTEREST. -- The term "investment interest" means interest paid or accrued on indebtedness incurred or continued to purchase or carry property held for investment. (E) DISALLOWED INVESTMENT INTEREST. -- The term "disallowed investment interest" means with respect to any taxable year, the amount not allowable as a deduction, solely by reason of the limitation in paragraph (1).
We note that, after the year in issue, the limitation on investment interest prescribed by section 163(d) was amended by: Section 56(b) of the Deficit Reduction Act of 1984, Pub. *411 L. 98-369, 98 Stat. 574; section 511(a) of the Tax Reform Act of 1986, Pub. L. 99-514, 100 Stat. 2244-2246; and section 1005(c)(1)-(3) of the Technical and Miscellaneous Revenue Act of 1988, Pub. L. 100-647, 102 Stat. 3390. In general, the 1984 amendment redefined the term "investment interest" to include the expenses incurred in connection with short sales. The 1986 amendment eliminated the allowance of $ 10,000 and limited the deduction for investment interest to net investment income. It also coordinated section 163(d) and section 469. The 1988 amendment modified the definition of the terms "investment income" and "investment interest." In this case, respondent determined that petitioners realized "investment income" within the meaning of section 163(d)(3)(B) in the amount of $ 19,712, consisting of the following dividend income reported on their return: E.F. Hutton
$ 5,588
Dean Witter
2,275
LaSalle Securities
1,221
Bache
2,511
Cohodas Paoli (38-0432290)
2,338
Cohodas Paoli (38-0432305)
1,093
Arcadian Mines, Inc. (38-6082547)
63
WISC Dist Co Houghton C P
4,623
Total
$ 19,712
Respondent also determined that petitioners incurred "investment expenses" *412 within the meaning of section 163(d)(3)(C), as follows: Depreciation
$ 453
Legal and Professional Services
1,218
Repairs
53
Rental -- Stock Ticker Machine
and Stock Subscription Services
7,983
Total
$ 9,707
Accordingly, respondent determined that petitioners realized "net investment income" within the meaning of section 163(d)(3)(A) in the amount of $ 10,005 (i.e., $ 19,712 less $ 9,707). Thus, he determined that the limitation under section 163(d) for 1982 is $ 20,005 (i.e., $ 10,005 plus $ 10,000). In his notice of deficiency, therefore, respondent disallowed the interest deduction claimed by petitioners on Schedule C in the amount of $ 64,300 and allowed an itemized deduction for interest in the amount of $ 20,005. Petitioners do not quarrel with respondent's computation of the section 163(d) limitation in this case. They contend that the interest which they paid to six brokerage firms in the amount of $ 64,300 is not "investment interest" and, accordingly, is not subject to the section 163(d) limitation. Petitioners claim that the interest was incurred in conducting a trade or business and not to purchase or carry property held for investment. See sec. *413 163(d)(3)(D); H. Rept. No. 91-413 (Part I), 1969-3 C.B. 200, 246. Petitioners assert that during 1982 Mr. Paoli was a "stock trader." They argue that he was "actively and continuously engaged in the business of buying and selling corporate stocks" and that "the regularity and extent of his activity is demonstrated by the several hundred purchase and sale transactions during 1982, which resulted in the sale of stocks totaling $ 9,827,405 that cost $ 10,759,393." They further argue that Mr. Paoli "did not hold [the] stocks for long periods of time hoping for capital appreciation, but sought short term swing gains on a regular and active basis." Therefore, petitioners argue that the entire amount of interest expense he paid is deductible under section 163(a). Respondent disagrees that petitioner's stock activities constituted the conduct of a trade or business. Even if they did, however, respondent further argues that petitioners failed to establish a connection between such trade or business and the subject interest payments. For the reasons stated below, we agree with respondent. Generally, for tax purposes, persons who purchase and sell stocks and securities fall *414 into one of three distinct categories: Dealers, traders, and investors. See Estate of Yaeger v. Commissioner, T.C. Memo 1988-264, affd. on this issue, 889 F.2d 29 (2d Cir. 1989). Both traders and dealers engage in the trade or business of buying and selling stocks and securities, whereas the activities of an investor do not qualify as a trade or business. Unlike a dealer whose business involves the sale of stocks or securities to customers, a trader does not have customers in his business. See King v. Commissioner, 89 T.C. 445, 458 (1987). Consequently, the stocks and securities held by a trader in his business are capital assets. See sec. 1221(1); King v. Commissioner, supra at 457-458; Kemon v. Commissioner, 16 T.C. 1026, 1032-1034 (1951). Traders occupy an unusual position under the tax law because they engage in a trade or business which produces capital gains and losses. King v. Commissioner, supra at 457. In order to qualify as a trader who is engaged in a trade or business, a taxpayer's activities must first be frequent, regular, and continuous. *415 According to the Supreme Court, not every income-producing and profit-making endeavor constitutes a trade or business. The income tax law, almost from the beginning, has distinguished between a business or trade, on the one hand, and "transactions entered into for profit but not connected with * * * business or trade," on the other. See Revenue Act of 1916, § 5(a) Fifth, 39 Stat. 759. Congress "distinguished the broad range of income or profit producing activities from those satisfying the narrow category of trade or business." Whipple v. Commissioner, 373 U.S. 193 at 197, 10 L. Ed. 2d 288, 83 S. Ct. 1168. We accept the fact that to be engaged in a trade or business, the taxpayer must be involved in the activity with continuity and regularity and that the taxpayer's primary purpose for engaging in the activity must be for income or profit. A sporadic activity, a hobby, or an amusement diversion does not qualify. [Commissioner v. Groetzinger, 480 U.S. 23, 35, 94 L. Ed. 2d 25, 107 S. Ct. 980 (1987); emphasis added.]
See also Zink v. United States, 929 F.2d 1015, 1021 (5th Cir. 1991); Estate of Yaeger v. Commissioner, 889 F.2d 29, 33 (2d Cir. 1989), affg. *416 in part and revg. in part T.C. Memo 1988-264; UFE, Inc. v. Commissioner, 92 T.C. 1314, 1322 (1989); Polakis v. Commissioner, 91 T.C. 660, 670-672 (1988); Juda v. Commissioner, 90 T.C. 1263, 1287 (1988), affd. 877 F.2d 1075 (1st Cir. 1989); King v. Commissioner, supra at 458. Activities that are sporadic, in the sense that they are not regular and continuous, do not qualify as a trade or business. See Polakis v. Commissioner, supra.The management of one's own investments is not considered a trade or business no matter how extensive or substantial the investments might be. See Higgins v. Commissioner, 312 U.S. 212, 216, 85 L. Ed. 783, 61 S. Ct. 475 (1941); King v. Commissioner, supra.Therefore, an investor is never considered to be engaged in a trade or business. Second, a trader's activities must seek profit from short-term market swings, unlike those of an investor who seeks capital appreciation and income and who is usually not concerned with short-term developments that would influence prices on the daily market. Purvis v. Commissioner, 530 F.2d 1332, 1334 (9th Cir. 1976), *417 affg. T.C. Memo 1974-164; King v. Commissioner, supra at 458-459. Thus, in order to qualify as a "trader" who was engaged in the trade or business of stock trading during 1982, petitioners must prove that Mr. Paoli was engaged in purchasing and selling stock regularly, frequently, and in substantial volume, and also that he sought to profit from short-term market swings, rather than from long-term appreciation and income. Whether petitioner's activities constitute a trade or business is a question of fact. See Estate of Yaeger v. Commissioner, T.C. Memo 1988-264. Petitioners bear the burden of proving that respondent's determination is erroneous. Rule 142(a), Tax Court Rules of Practice and Procedure; Polakis v. Commissioner, supra at 667. In this case, it is clear that petitioners made a large number of purchases and sales of stock in 1982, involving a substantial amount of money. In fact, petitioners reported 326 sales of stocks or options during the year 1982, involving approximately $ 9 million worth of stocks or options which had been purchased for approximately $ 10 million. It is also *418 apparent that many of their transactions involved stocks which they had held for less than one day. Out of the 326 sales made by petitioner in 1982, 205, or 62.88 percent, involved stocks held for less than 31 days. The proceeds realized by petitioner from these sales were $ 7,713,025.69, or 78.49 percent of the total proceeds. Despite the above facts, petitioners have not proved that their pattern of buying and selling stocks was sufficiently regular and continuous during the entire year of 1982 to constitute a trade or business. Our analysis of the Schedule of Gains and Losses, attached to petitioners' 1982 tax return, shows that Mr. Paoli extensively engaged in stock transactions principally during the 1-month period between January 12 and February 11. Of the 326 sales of stocks made during 1982, 125 of them, nearly 40 percent, were made during this 1-month period. The proceeds realized from sales during this period amounted to $ 5,337,671.25, 54.32 percent of the total sales proceeds for the year. During January, February, March, and May 1982, petitioners reported 233 sales, 71.47 percent of the total sales for the year, from which they realized $ 8,826,680.89, approximately *419 90 percent of total proceeds for the year. Seventy percent of the total losses reported by petitioners for the year, or $ 892,617.05, were incurred during this period. During April, June, July, August, and September, petitioner's stock activities were far less extensive than his activities during the earlier part of the year. Finally, petitioners reported only one sale of stock in October and no sale in November or December. Even during the more active period of petitioner's stock transactions, his pattern of buying and selling varied significantly from month to month. Most of the transactions made during the 1-month period between January 12 and February 11 involved stocks held for less than a day, which petitioner described as "day trades." During March and May, however, the number of "day trades" declined substantially, and a substantial portion of sales involved stocks held for more than one month. During April, June, July, August, and September, the number of "day trades" was negligible. The only sale made in October involved stock held for more than a year and a half. As mentioned above, no sale was made during November or December. The pattern of petitioner's purchases *420 and sales of stocks during 1982 which emerges from the Schedule of Gains and Losses is depicted in the following two graphs. Graph I depicts the number of sales petitioner made during each month of 1982, broken down by the holding period of the stock sold (i.e., the information contained in Table I above). [SEE ILLUSTRATION IN ORIGINAL ] Graph I Number of Sales and Holding Period Graph II depicts the aggregate amount realized from sales during each month of 1982, broken down by the holding period of the stocks sold (i.e., the information contained in Table II above). [SEE ILLUSTRATION IN ORIGINAL ] Graph II Sales Price and Holding Period It is readily noted from both of the above graphs that petitioner was actively engaged in the sale of a substantial volume of stocks during January, February, and March of 1982 and that the frequency and volume of his sales decreased through September and there was virtually no activity during the last quarter of the year. Petitioner testified that he spent 4 or 5 hours every day engaged in his stock purchase and sale activity. While this testimony would tend to support his claim that the activity constituted a trade or business, *421 we find it unconvincing. It is conceivable that petitioner spent 4 or 5 hours per day engaged in the activity during the early part of the year, especially during the one-month period between January 12 and February 11. However, it is hard to believe that such pattern continued throughout the year, while the number and volume of stock transactions almost continuously declined. We find it especially hard to believe, for example, that petitioner spent 4 or 5 hours every day in October, November, and December, making only one sale and no purchase of stock during that 3-month period. We do not accept Mr. Paoli's testimony on this point. We are not required to accept the unpersuasive testimony of an interested party or witness. Wood v. Commissioner, 338 F.2d 602, 605 (9th Cir. 1964); Archer v. Commissioner, 227 F.2d 270 (5th Cir. 1955); Weiss v. Commissioner, 221 F.2d 152 (8th Cir. 1955); Davis v. Commissioner, 88 T.C. 122 (1987), affd. 866 F.2d 852 (6th Cir. 1989); Tokarski v. Commissioner, 87 T.C. 74 (1986). We also note that, during the year 1982, the purchase and *422 sale of stock was not the only activity in which petitioner engaged for the production of income. He provided management and other services to Paoli Manufacturing Corporation, for which he received a management fee of $ 100,000. Clearly, therefore, petitioner had a source of substantial income unrelated to his stock activity and, thus, he was not required to rely on his stock activity as the sole means of his livelihood. Cf. Commissioner v. Groetzinger, 480 U.S. 23, 35-36, 94 L. Ed. 2d 25, 107 S. Ct. 980 (1987). In summary, while petitioner's stock activity during the 1-month period between January 12 and February 11 resembles that of a trader, such pattern did not continue throughout the year. Moreover, we do not accept petitioner's brief testimony that he spent 4 hours per day throughout the year engaged in the activity. Furthermore, we note that petitioner received substantial compensation for the services provided to his corporation. We find no other evidence in the record from which we can conclude that petitioner engaged in his stock activity as a "trader," rather than as an investor. Thus, on balance, we cannot fairly conclude that petitioners satisfied their burden of proof, *423 and we sustain respondent's determination that the subject interest petitioners paid to brokerage firms was investment interest within the meaning of section 163(d). Even if we were to find that petitioner was engaged in the trade or business of trading stocks during 1982, the record in this case does not establish what, if any, connection the subject interest payments bore to that trade or business. Petitioners, of course, bear the burden of proving such relationship. Rule 142(a), Tax Court Rules of Practice and Procedure; see Paoli v. Commissioner, T.C. Memo 1988-23, 1988 Tax Ct. Memo LEXIS 21, 54 T.C.M. (CCH) 1574, T.C.M. (RIA) 88023 at 142. First, we note that petitioners seek to deduct interest payments made to six brokerage firms but they did not introduce into evidence any documents from those firms to establish the nature of those payments or their relationship to a trade or business. The documentary evidence on which petitioners rely, the Schedule of Gains and Losses attached to their 1982 return, reports the gains and losses from petitioners' sales of stocks and options. It does not purport to establish any relationship between those sales of stocks *424 and the subject interest payments. For example, the Schedule of Gains and Losses does not show any purchase or sale of stock through Dean Witter Reynolds, Inc., whereas petitioners seek to deduct interest payments to Dean Witter in the amount of $ 8,205. Mr. Paoli's testimony does not establish the purpose of that interest payment. Indeed, he testified that he was not permitted to trade "on the institutional desk" at Dean Witter and that he did not have "a private line" to Dean Witter during 1982. Similarly, petitioners seek to deduct interest payments to E.F. Hutton in the amount of $ 23,677. Of the total sales reflected on the Schedule of Gains and Losses, it appears that less than 4 percent were made through an account at E.F. Hutton and those sales involved the stock of Republic Corporation. Mr. Paoli's testimony does not establish a business relationship of those sales of stock to the interest paid to E.F. Hutton. See Paoli v. Commissioner, supra.
In fact, Mr. Paoli's testimony fails to establish a "linkage" between any of the subject interest payments and a stock trading business. Mr. Paoli's testimony consisted of a general *425 statement that he maintained an account with each of the subject brokerage firms and paid interest to each of those firms in the amount listed on his return. Mr. Paoli testified as follows on cross-examination: Q. Is it your understanding that interest on a margin account is computed based on an average margin balance on that account? A. I believe so, yes. In other words how much the company has loaned you against the securities in your account, yes, that would be correct. Q. And is that your understanding of how the interest on your accounts was computed in 1982? A. I believe so, yes.
Mr. Paoli also agreed with his attorney who asked on redirect, "during 1982 the securities that you held in margin accounts, were they used to finance your trading activities?" Thus, the thrust of Mr. Paoli's testimony is that all of the interest paid to brokerage firms during 1982 is deductible because it was paid to "finance trading activities." However, it is clear that interest paid on margin accounts can finance a taxpayer's investment activities, as well as trading activities. Paoli v. Commissioner, supra. Mr. Paoli's testimony *426 does not sufficiently establish a link to a stock trading business, as opposed to investment activity. The next issue for decision is whether petitioners are liable for self-employment tax on Mr. Paoli's management fee of $ 100,000 from Paoli Manufacturing Corporation. Self-employment tax is imposed on self-employment income of individual taxpayers. Sec. 1401. "Self-employment income" is defined as the "the net earnings from self-employment derived by an individual." Sec. 1402(b). The term "net earnings from self-employment" means "the gross income derived by an individual from any trade or business carried on by such individual, less the deductions allowed * * * which are attributable to such trade or business." Sec. 1402(a). Petitioners bear the burden of showing that respondent's determination of deficiency in the self-employment tax is erroneous. Rule 142(a), Tax Court Rules of Practice and Procedure. However, they failed to introduce any evidence concerning this issue and, thus, have completely failed to satisfy that burden of proof. Moreover, they did not make any argument concerning this issue of brief. Thus, by failing to address the issue either at trial or on brief, *427 petitioners have conceded it and we sustain respondent's determination of deficiency in the self-employment tax. See Rule 149, Tax Court Rules of Practice and Procedure; Cerone v. Commissioner, 87 T.C. 1, 2 n.1 (1986); Shriver v. Commissioner, 85 T.C. 1, 2 n.1 (1985); Handke v. Commissioner, T.C. Memo 1990-273. The last issue for decision is whether petitioners are liable for additions to tax under sections 6651(a)(1), 76653(a)(1) and (2), and 6661. Section 6651(a)(1) imposes an addition to tax for failure to file a timely return, "unless it is shown that such failure is due to reasonable cause and not due to willful neglect." Petitioners' Federal income tax return for 1982 was due to be filed on April 15, 1983, but it was not filed until July 23, 1984, more than a year after the due date. Petitioners bear the burden of proving that their failure to file a timely tax return was due to reasonable cause and not due to willful neglect. United States v. Boyle, 469 U.S. 241, 245, 83 L. Ed. 2d 622, 105 S. Ct. 687 (1985); Estate of Newton v. Commissioner, T.C. Memo 1990-208. However, petitioners failed to produce any *428 evidence to explain their late filing and they failed to address this matter on brief. Therefore, we sustain respondent's determination that petitioners are liable for the addition to tax under section 6651(a)(1). Section 6653(a)(1) imposes an addition to tax equal to 5 percent of an underpayment of tax, or any part thereof, attributable to negligence or intentional disregard of rules or regulations. Section 6653(a)(2) imposes an addition to tax equal to 50 percent of the interest due with respect to such portion of the underpayment that is attributable to negligence or intentional disregard of rules or regulations. Respondent determined that the entire underpayment of petitioners' Federal income tax for 1982 was due to negligence or intentional disregard of rules and regulations. Petitioners argue that, if there is an underpayment of tax, it is not due to negligence or intentional disregard of rules or regulations because they relied on the advice of a certified public accountant, Mr. Richard K. Ehlers. See, e.g., Conlorez Corp. v. Commissioner, 51 T.C. 467, 475 (1968). Mr. Paoli testified that he consulted with Mr. Ehlers in connection with the preparation *429 of petitioners' 1982 tax return, that Mr. Ehlers opined that petitioner was in the trade or business of trading stocks and securities, and that it was Mr. Ehlers' position that the subject interest deductions were proper. Mr. Ehlers died in 1985 and was not available at trial. Petitioners introduced into evidence a letter written by Mr. Ehlers to the Internal Revenue Service, dated June 30, 1981. In the letter, Mr. Ehlers requested a conference with respondent's appeals office concerning petitioners' 1978 and 1979 Federal income tax returns. During an audit of those returns, it appears respondent had raised the same issue presented here, i.e., whether the interest paid by petitioners to brokerage firms in 1978 and 1979 was investment interest for purposes of section 163(d). Mr. Ehlers argued, based upon facts similar to those presented by petitioners in this case, that "Mr. Paoli, in our opinion, qualifies as a trader of securities." Mr. Ehlers concluded, "Penalties under Section 6653(a) of the Internal Revenue Code are not applicable as the taxpayer was, and is, of the opinion he qualified as a trader of securities and the deductions taken were not the result of negligence or *430 intentional disregard of the rules or regulations." We cannot infer from Mr. Ehlers' letter dated June 30, 1981, concerning the audit of petitioners' 1978 and 1979 returns, that Mr. Ehlers also advised petitioners circa July of 1984 that Mr. Paoli was a "trader" during 1982. After all, the interest deductions taken by petitioners on those earlier returns were "disallowed" by the agent and became the subject of a notice of deficiency issued by respondent on November 5, 1982. Paoli v. Commissioner, 54 T.C.M. at 1578, 57 P-H Memo T.C. par. 88,023 at 145. Normally, in formulating advice to a client, a certified public accountant takes into account the action of the Internal Revenue Service concerning the same deduction in an earlier year. Thus, we cannot simply infer in this case that Mr. Ehlers gave petitioners the same advice for 1982 as he had given to them for 1978 and 1979. Moreover, we note that petitioners failed to advance Mr. Ehlers' advice in a prior case involving their 1981 Federal income tax return, a return which Mr. Ehlers had also prepared. Paoli v. Commissioner, 54 T.C.M. at 1578, 57 P-H Memo T.C. par. 88,023 at 145. *431 That case involved respondent's determinations that Mr. Paoli was not a trader during 1981 and that petitioners had negligently or intentionally disregarded the tax code in filing a return which suggested that he was. See Paoli v. Commissioner, 57 P-H Memo T.C. at 88,023 at 145. It appears that petitioners said nothing in that case of any advice of Mr. Ehlers, the return preparer, or of any other professional. See Paoli v. Commissioner, supra.For these reasons, we are not satisfied that petitioners have met their burden of proving that respondent erroneously determined the additions to tax for negligence under section 6653(a) on that part of the underpayment of tax attributable to the deduction of investment interest. See Rule 142(a), Tax Court Rules of Practice and Procedure; Patin v. Commissioner, 88 T.C. 1086, 1131 (1987), affd. without published opinion sub nom. Hatheway v. Commissioner, 856 F.2d 186 (4th Cir. 1988), affd. sub nom. Skeen v. Commissioner, 864 F.2d 93 (9th Cir. 1989), affd. without published opinion 865 F.2d 1264 (5th Cir. 1989), *432 affd. sub nom. Gomberg v. Commissioner, 868 F.2d 865 (6th Cir. 1989). Petitioners have offered no explanation for their failure to treat Mr. Paoli's compensation from Paoli Manufacturing Corporation as earnings from self-employment. Accordingly, we sustain respondent's determination of the additions to tax for negligence under section 6653(a) on that part of the underpayment of tax attributable to self-employment tax. Finally, section 6661 imposes an addition to tax equal to 25 percent of a "substantial understatement" of income tax. The term "understatement" is defined as the excess of the amount of the tax required to be shown on the return for the taxable year over the amount of the tax shown on the return. Sec. 6661(b)(2)(A). An understatement is "substantial" if it exceeds the greater of 10 percent of the tax required to be shown on the return or $ 5,000. Sec. 6661(b)(1)(A). Petitioners offered nothing to rebut respondent's determination that petitioners are liable for the addition to tax under section 6661. Accordingly, we sustain respondent on this point as well. Petitioners have conceded that they are not entitled to the deduction claimed on their 1982 Federal income tax return in the amount $ 160,506 for a net operating loss carryover from 1981. They offer no defense to respondent's determination of the additions to tax for negligence under section 6653(a) on the portion of the underpayment attributable to this issue, other than the argument that they relied upon the advice of their certified public accountant. We have considered and rejected that argument above. Accordingly, we sustain respondent's determination that the portion of the underpayment which is based upon the disallowance of the net operating carryover deduction from 1981 in the amount of $ 160,506 is attributable to petitioners' negligence and, thus, is subject to the additions to tax under section 6653(a). To reflect the foregoing and certain agreements of the parties, Decision will be *433 entered under Rule 155.